# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

SALES RESOURCE, INC., d/b/a/ )
RESOURCE ONE, )
             )
      Plaintiff, )
             )
     vs. )    **Case number 4:08cv0732 TCM**
             )
ALLIANCE FOODS, INC. and )
MORAN FOODS, INC., d/b/a )
SAVE-A-LOT, LTD., )
             )
      Defendants. )
             )
and )
             )
HALLS SALES AND MARKETING, )
INC., )
             )
      Plaintiff, )
             )
     v. )    **Case no. 4:09cv0666 TCM**
             )
ALLIANCE FOODS, INC., and )
MORAN FOODS, INC., d/b/a )
SAVE-A-LOT, LTD., )
             )
      Defendants. )

## MEMORANDUM AND ORDER

This matter is before the Court[1] on a motion for partial summary judgment against

defendant Alliance Foods, Inc. ("Alliance") and defendant Moran Foods, Inc., d/b/a Save-A-

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of
the parties. See 28 U.S.C. § 636(c).

Lot, Ltd. ("Save-A-Lot") filed by plaintiff Halls Sales and Marketing, Inc. ("Halls Sales") (Doc. 163).[2] Alliance and Save-A-Lot (collectively, Defendants) have filed briefs in opposition to Halls Sales's motion, and Halls Sales filed a reply brief. Additionally, the parties have filed statements of material facts, declarations, affidavits, and exhibits in support of their positions on the motion for summary judgment.

Defendants have also filed motions for summary judgment against Halls Sales and the other plaintiff, Sales Resource, Inc., d/b/a/ Resource One ("Resource One") (Docs. 198, 202, 209, and 210). While the Court will consider the parties' memoranda, replies, and evidentiary materials regarding Defendants' motions for summary judgment to the extent they address the issues raised in Halls Sales's motion for partial summary judgment, those motions are not otherwise addressed in this decision and remain pending,[3] along with other motions

_____

[2] The Court consolidated these cases, with the agreement of the parties, for purposes of pretrial proceedings, reserving for a later time the decision whether to consolidate the cases for trial. (Order dated June 16, 2009 [Doc. 143].)

Earlier, the Court denied Alliance's motions to dismiss the complaints. (Doc. 149.)

[3] One of the other pending motions for summary judgment is Alliance's cross-motion for summary judgment against Halls Sales (Doc. 202), which presents issues additional to the issues raised in Halls Sales's motion for partial summary judgment and very similar to issues raised in the other pending motions for summary judgment filed by Defendants. When a party files a cross-motion for summary judgment, this "does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." **Wermager v. Cormorant Twp. Bd.**, 716 F.2d 1211, 1214 (8th Cir. 1983). For a party moving for summary judgment "concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of [the party's] own motion." 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2720 at 332 (3rd ed. 1998) (footnote omitted). A court considers each motion separately to ascertain whether the moving party has satisfied its burden, and "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." Id. at 335-36. Because cross-motions for summary judgment should be considered separately,

the parties have filed (Docs. 252, 254, 256, 296, and 302).

Resource One and Halls Sales (collectively, Plaintiffs) are brokers representing food manufacturers, suppliers, and processors (collectively, vendors)[4] in the sale of private label products[5] to Save-A-Lot. Alliance is a broker competing with Plaintiffs in the sale of vendors' private label products to Save-A-Lot. Plaintiffs allege that around September 2007 Defendants entered into a business arrangement that adversely affected Plaintiffs' relationship with their vendors, resulting in Plaintiffs' loss of certain vendors by early 2008.[6]

By their pending complaints (Doc. 123 in 4:08cv0732TCM and Doc. 1-3 in

because Halls Sales makes an assumption about Defendants' position for purposes of its motion for partial summary judgment that is not assumed in the other pending motions for summary judgment, and because the cross-motion presents additional issues that are similar to those in the Defendants' other summary judgment motions, the Court considers Halls Sales's motion for partial summary judgment separately from Alliance's cross-motion for summary judgment.

[4] The parties use various terms to refer to the entities involved in the sale of products to companies, like Save-A-Lot, that sell those products either to members of the public or to related businesses. For convenience, the Court will refer to the sellers of the products as vendors; will refer to those purchasing the products from the vendors, like Save-A-Lot, as buyers; and will refer to the purchasers of Save-A-Lot's items as customers, which reference includes members of the general public who purchase items at a Save-A-Lot corporate store and licensees who purchase items from Save-A-Lot for resale to members of the general public through a Save-A-Lot licensed store.

[5] A product referred to as "private label," "exclusive brand," or "store brand" carries the label of the store selling the item, here Save-A-Lot's label, and does not carry the label of a national branded product such as Coca Cola, Pepsi, Tide, or Ivory products.

[6] The undisputed record reveals that Alliance and Save-A-Lot had a business arrangement prior to September 2007 that was effective until January 1, 2008, but the claims in this case focus on Plaintiffs' loss of vendors by early 2008 as a result of the change in Defendants' business arrangement as announced in late September 2007.

4:09cv0666TCM),[7] Plaintiffs seek monetary and injunctive relief based on Defendants' allegedly tortious interference with Plaintiffs' business relationships and business expectancies, as well as unfair competition. In their answers (Doc. 12 in 4:09cv0666TCM and Docs. 130, 150, and 151 in 4:08cv0732TCM), Defendants deny the allegations, in large part, and set forth numerous affirmative defenses. The Court now has under consideration only Plaintiff Halls Sales's motion for partial summary judgment against Defendants.

## Background

The undisputed material facts[8] disclose that Plaintiff Halls Sales is a food broker representing a number of manufacturers of food and food-related products (collectively, vendors) in their sales to Save-A-Lot only. (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶ 4 [Doc. 165 in Cause No. 4:08cv0732TCM];[9] Def. Alliance's Statem. Uncontr. Mat. Facts Supp. Its Mot. Summ. J. against Halls Sales ¶ 25 [Doc. 205].) Halls Sales has been in business since 2001 and, in September 2007, represented nine vendors on sales of their products to Save-A-Lot. (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶ 5 [Doc. 165].) The business is owned by Gary Halls and has had up to two employees, one of whom is Gary

---

[7] These lawsuits were originally filed in the Circuit Court of St. Louis County, Missouri, and were subsequently removed to this Court.

[8] The undisputed facts set forth by the Court are from the allegations in Halls Sales's complaint to the extent they are admitted by Defendants in their Answers; from statements in the parties' statements of undisputed material facts supporting all the pending motions for summary judgment motions to the extent they are admitted by the opposing party or parties and pertain to Halls Sales's motion for partial summary judgment; and from the uncontradicted record.

[9] Unless otherwise noted, all subsequent references to document numbers are references to documents in case number 4:08cv0732TCM.

Halls.  (Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 21 [Doc. 216].)  Halls Sales

advocates for its vendors on their sales to Save-A-Lot; is paid a commission by the vendors

it represents; and does not receive compensation from or pay money to Save-A-Lot.  (Pl.

Halls Sales's Statem. Uncontr. Mat. Facts ¶ 5 [Doc. 165].)

Defendant Alliance is a food broker[10] that has been in existence since approximately

1928; and has recently represented at least 150 vendors in their sales to Save-A-Lot.  (Pl.

Halls Sales's Statem. Uncontr. Mat. Facts ¶ 7 [Doc. 165]; Def. Alliance's Statem. Uncontr.

Mat. Fact Supp. Mot. Summ. J. against Halls Sales ¶ 21 [Doc. 205].)  Alliance started

representing vendors to Save-A-Lot when Save-A-Lot began its business in 1978, and by the

mid-1990s Alliance represented vendors exclusively to Save-A-Lot.[11]  (Def. Alliance's

---

[10]  Alliance also owns fifteen Save-A-Lot stores.  (Def. Alliance's Statem. Uncontr. Mat. Fact Supp. Its Mot. Summ. J. against Halls Sales ¶ 24 [Doc. 205].)

[11]  In 1968, Alliance, then known as Alliance Associates, Inc., and its officer, E. Lee Feller, entered into a consent order with the Federal Trade Commission (FTC) directing Alliance and Feller to stop certain conduct that allegedly violated § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(c).  **In the Matter of Alliance Associates, Inc.,** 73 F.T.C. 950 (1968) ("1968 FTC consent order").  (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶¶ 7-13 [Doc. 165].)  As of January 2, 1996, this 1968 FTC consent order had expired.  16 C.F.R. § 3.72(b)(3) ("an order issued by the [FTC] before August 16, 1995, will be deemed, without further notice or proceedings, to terminate 20 years from the date on which the order was first issued, or on January 2, 1996, whichever is later").  While there are exceptions to this provision, the record does not reveal that any exception applies.  In its motion for partial summary judgment, Halls Sales notes "[t]he cease and desist order may have expired, but [Halls Sales] asserts the law upon which it is based is unchanged."  (Pl. Halls Sales's Statem. Uncontr. Mat. Facts [Doc. 165].)  The extent to which the circumstances relevant to the 1968 FTC consent order are similar to or different from the circumstances of this case is also not clear; the parties have not addressed that for purposes of this motion for partial summary judgment.  Under the circumstances, the Court will not further consider what effect, if any, the 1968 FTC consent order has on the issues presented by Halls Sales's motion for partial summary judgment.

Statem. Uncontr. Mat. Fact Supp. Its Mot. Summ. J. against Halls Sales ¶¶ 22, 23 [Doc. 205].)  Alliance is a legal entity separate from  Save-A-Lot.  (Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 28 [Doc. 216].)

Defendant Save-A-Lot is a wholly owned subsidiary of Supervalu and operates both as a wholesaler of certain products to its licensed stores and to others, and as a retailer through the operation of retail grocery stores.  (Pl. Halls Sales's Statem. Uncontr.Mat. Facts ¶ 1 [Doc. 165].)  Save-A-Lot purchases the products it needs from vendors and resells the products, at prices it determines, either to licensees with whom it has license agreements or to the general public through its corporate-owned retail stores.  (Id. ¶ 2.)  The products Save-A-Lot purchases and resells are predominantly private label products, although it does offer other products as well.  (Id. ¶¶ 1, 2.)  Save-A-Lot is not a food broker and does not sell any product on consignment.  (Id. ¶ 3.)

Originally, Save-A-Lot came to the market as a product-centered retailer focusing on buying products for the least expensive price and, in turn, selling them to its customers.  In 2007, Save-A-Lot changed its go to market strategy adopting a consumer-centric approach focusing on its customers and the products that they needed and wanted.  That change was revolutionary for Save-A-Lot although other grocery retailers had already made that change.  As part of the change, Save-A-Lot entered into a strategic relationship with Alliance under which Alliance for the benefit of its vendors agreed to help Save-A-Lot achieve its goal by helping to better understand the wants and needs of its customers, to better merchandise and market products at the stores, and to better promote and advertise products to its customers.

(Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 2 [Doc. 216]; Save-A-Lot's Statem.

Uncontr. Mat. Facts Supp. Mot. Summ. J. Against Halls Sales ¶ 2 [Doc. 214].)[12]

Save-A-Lot's President and CEO, Bill Shaner, announced this business relationship between Save-A-Lot and Alliance in a letter to vendors, dated September 28, 2007, stating:

> To Our Valued Exclusive Brand Product Suppliers:
>
> During the past several months, Save-A-Lot has undertaken a thorough analysis of our exclusive brand product program to determine the most effective way to market what we believe is one of our most important strategic and competitive advantages. As you know, our number one priority is to offer our customers exceptional quality products at unbelievable value. The foundation and strength of the Save-A-Lot format relies heavily on the acceptance and success of our exclusive brands.
>
> As one of our exclusive brand product suppliers, we consider you a vital component to the success of this program, and to the extent we are successful, you in turn will be successful in expanding your distribution and sales. Our analysis has identified several opportunities to enhance the merchandising, marketing[,] and sales of our exclusive brands and at the same time to become more customer focused and deepen our understanding of our customer[s'] wants and needs.
>
> In order to reinforce our efforts and focus in this regard, we have selected

_____

[12] This statement of fact is not a direct quote of Save-A-Lot's President and CEO Bill Shaner, the reference cited in support of the statement. (To see the Shaner deposition testimony cited by Save-A-Lot in support of paragraph 2 in its statements of facts, except for page 189 of the deposition which the Court is unable to locate in the available summary judgment record, see the Shaner Deposition excerpts at Doc. 231-3 rather than those at Doc. 227-20.) Halls Sales admits Shaner testified as stated in the statement of fact, and the Court has, therefore, quoted the statement of fact.

While Halls Sales admits Shaner testified as noted, Halls Sales states "the relationship [Save-A-Lot had] with Alliance was entered into as set forth in" paragraphs 19 through 39 of Halls Sales's Statement of Facts (Doc. 165). (Pl. Halls Sales's Resp. to Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 2 [Doc. 271]; see also Pl. Halls Sales's Resp. to Save-A-Lot's Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. Against Halls Sales ¶ 2 [Doc. 273].) Those paragraphs address the period from early 2007 to early September 2007, when Save-A-Lot was considering Alliance and another broker and then selected Alliance as the broker for this new business focus or project of Save-A-Lot. (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶¶ 19-39 [Doc. 165].)

Alliance Foods, Inc. as a primary strategic resource and merchandising and marketing partner to help us expand and further develop our exclusive brand program. Save-A-Lot and Alliance will immediately begin work on new initiatives to enhance Save-A-Lot's exclusive brand product program, with an expectation of full implementation effective January 1, 2008. We believe our relationship with Alliance will benefit our respective businesses by increasing sales of Save-A-Lot exclusive brand products and that Alliance's services will complement our plans for our exclusive brand product program.

Alliance has 82 years of experience in the food industry, working with large regional and national companies in the development of private label programs. We have asked representatives of Alliance to contact you to explain our initiative. While we certainly are not requiring our exclusive brand product suppliers to work with Alliance, to the extent you are contractually free to do so, we would encourage you to consider the services Alliance offers in marketing and merchandising the exclusive Save-A-lot products you supply.

We look forward to working with you and implementing all facets of this exciting initiative. Should you have any questions, please contact Steve H Harris, Senior Vice-President, Merchandising at Save-A-Lot . . . .

Sincerely,

Moran Foods, Inc., d/b/a Save-A-Lot, Ltd.

Bill Shaner
President & CEO

(Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 3 [Doc. 216 at 35-36]; Save-A-Lot Ex. 21 [Doc. 227-21].) After this letter was sent, representatives of Save-A-Lot and Alliance had conversations and meetings with vendors' representatives, and tracked the status of the effort to persuade vendors to hire Alliance as their broker.[13] (See, e.g., Pl. Halls Sales's

---

[13] For example, in October 2007, Alliance created vendor migration reports tracking the status of vendors and their hiring of Alliance as their broker. (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶ 94 [Doc. 165].) The vendor migration reports show the status of each vendor's decision about which broker to use and contain color-coding of vendors, with green meaning that the vendor

Statem. Uncontr. Mat. Facts ¶ 94 [Doc. 165].)

By early 2008, four of Halls Sales's vendors, Baumer Foods, Liberty Gold, Malt-O-Meal, and Vista Bakery, Inc. or Lance Private Brands ("Vista Bakery/Lance"), had terminated their brokerage relationship with Halls Sales and hired Alliance as their broker.[14] (Pls.' Answer to No. 7 of Alliance's First Set of Interrogatories Directed to Halls Sales [Doc. 370-70]; Def. Alliance's Statem. Uncontr. Mat. Facts Supp. Its Mot. Summ. J. against Halls Sales ¶ 51 [Doc. 205].)

Additionally, in January 2008, Defendants' top management began participating in regular meetings, and Alliance began paying Save-A-Lot a substantial percentage of the brokerage commissions Alliance received from its vendors. (Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶¶ 29, 36, 42 [Doc. 216].) The money paid by Alliance was to be used by Save-A-Lot to provide promotions and advertising. (Id. ¶¶ 30, 31.)

By its motion for partial summary judgment, Plaintiff Halls Sales contends only that Defendants' conduct violates § 2 (c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(c) (may be referred to as § 2(c) of the Robinson-Patman Act), and this statutory violation supports a determination that Defendants' conduct is not justified for

---

would hire Alliance and red meaning that the vendor would not hire Alliance. (Id.) If a vendor would not hire Alliance, Alliance would look for a replacement vendor. (Id.) Save-A-Lot personnel provided some of the information on the vendor migration reports and attended some vendor migration meetings. (Id.)

[14] Halls Sales also lost another vendor, Coffee Holding, in early 2008 but that vendor subsequently re-established a brokerage relationship with Halls Sales and is not at issue in this lawsuit. (See Pls.' Answer to No. 7 of Alliance's First Set of Interrogatories Directed to Halls Sales [Doc. 370-70].)

purposes of Halls Sales's claim that Defendants tortiously interfered with Halls Sales's business relationships.

Summary judgment standard. Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (quotation marks omitted) (quoting Rule 56(c) of the Federal Rules of Civil Procedure). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman,** 953 F.2d 394, 395 (8th Cir. 1992) (quotation marks omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The initial burden is on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **Van Horn v. Best Buy Stores, L.P.,** 526 F.3d 1144, 1146 (8th Cir. 2008) ("the defendants met their initial burden of notifying the . . . court of the basis for their summary judgment motion and identifying the documents that they believed demonstrated the absence of a material fact"). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,** 475 U.S. 574, 586 (1986). Instead, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial.

**Anderson v. Liberty Lobby, Inc**., 477 U.S. 242, 249 (1986); **Palesch v. Missouri Comm'n on Human Rights**, 233 F.3d 560, 565-66 (8th Cir. 2000).  "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998).  See also **Stanback v. Best Diversified Prods., Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party.  See **Ghane v. West,** 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993).  Importantly, in resolving a motion for summary judgment, the Court does not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." **Morris v. City of Chillicothe**, 512 F.3d 1013, 1018 (8th Cir. 2008).

Halls Sales's motion for partial summary judgment addresses only its tortious interference claim against Defendants.  To make a submissible case on its tortious interference claim, Halls Sales must demonstrate "(1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." **Stehno v. Sprint Spectrum, L.P.**, 186 S.W.3d 247, 250 (Mo. 2006) (en banc).  In particular, in this motion

for partial summary judgment Halls Sales focuses only on the fourth element of this claim, the absence of justification element.

The fact that the defendant is motivated by self-interest and that the conduct may have a negative effect on a plaintiff's business expectancies are not enough to establish an absence of justification.  See **SSM Health Care, Inc. v. Deen**, 890 S.W.2d 343, 346 (Mo. Ct. App. 1994) (addressing self-interest motivation); **Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n**, 796 S.W.2d 369, 373 (Mo. 1990) (en banc) (addressing negative effect).  Rather, to satisfy the absence of justification element, Halls Sales must, in relevant part, demonstrate that Defendants used "improper means" when interfering with Halls Sales's business relationships or expectancies.  **Stehno**, 186 S.W.3d at 252.  "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law."  **Id.**

In its motion for partial summary judgment, Halls Sales argues that Defendants' conduct satisfies the "improper means" element of the tortious interference claim because the conduct violates § 2(c) of the Robinson-Patman Act.  Specifically, Halls Sales contends that the services that Halls Sales assumes Save-A-Lot is providing to Alliance's vendors for commissions Alliance pays to Save-A-Lot do not fall within the "services rendered" exception in § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), and such payments are illegal under that statutory provision, as a matter of law.  (Pl. Halls Sales's Mem. Supp. Mot.

for Partial Summ. J. at 6 [Doc. 164]; Pl. Halls Sales's Reply in Supp. Mot. Partial Summ. J. Against Defendants at 4 [Doc. 270].) The assumed services are the advertising and other services Save-A-Lot reportedly provides for commission dollars it receives from Alliance to get the vendors' products sold to Save-A-Lot's customers[15] (Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶¶ 41, 46 [Doc. 165]) and include the following activities reported by Defendants' expert, Scott Stringer:[16]

- *National Advertising Circulars* - [Save-A-Lot] incurs total costs up to approximately $1 million for each national advertising circular it develops. These circulars include promotion of private label brands including products sold by Alliance vendors, and cover approximately 1,200 store locations. Costs to produce these circulars include among other things, ad development, graphics, print cost, and shipment.

- *NASCAR sponsorship* - For the last several years, [Save-A-Lot] spent several million dollars annually to promote its private label brands, including products sold by Alliance vendors, through a NASCAR sponsorship. In addition to name recognition, [Save-A-Lot] toured the country as well as NASCAR races with its "Cookout Coach." Private

---

[15] Other than in its motion for partial summary judgment, Halls Sales's position in this lawsuit is that Save-A-Lot received the money from Alliance " for [Save-A-Lot's efforts in] putting pressure on the vendors [beginning in late September 2007] to appoint Alliance" as their broker. (See, e.g., Pl. Halls Sales's Mem. Supp. Mot. Partial Summ. J. at 6 [Doc. 164].)

[16] Halls Sales also cites other aspects of Defendants' conduct as some of the assumed services Defendants engaged in for purposes of this motion for partial summary judgment. (See ¶¶ 40, 42-45, 47-48, and 50-57 of Halls Sales's Statem. Uncontr. Mat. Facts [Doc. 165] as cited at Halls Sales's Mem. Supp. Mot. Partial Summ. J. at 6 [Doc. 164].) The Court is not considering those paragraphs because they focus on why Save-A-Lot chose Alliance (id. ¶ 40) or on services provided by Alliance to Save-A-Lot (id. ¶ 42), which are not at issue in this motion for partial summary judgment that focuses on Alliance's payments of commissions to Save-A-Lot for its services provided to Alliance's vendors; or Defendants do not admit some or all of the statements in the paragraphs (id. ¶¶ 40-41, 43-45, 47-48, 40-54, and 56-57); or it is not clear that some or all of the statements apply to the period after January 1, 2008, that is the period of assumed services relevant to this case (id. ¶¶ 47, 52, 54, 55, and 57).

label brands and recipes using these products were prepared and promoted to the public at these tailgating events.

- *In-store coupons* - [Save-A-Lot] promotes the private label brands including products sold by Alliance vendors through in-store coupons. While branded products typically have the cost of these coupons either shared by the retailer or paid entirely by the food manufacturer, [Save-A-Lot] incurs 100% of the cost of producing, distributing, and redeeming these coupons.

- *Radio and television advertising* - [Save-A-Lot] promotes the private label brands, including products sold by Alliance vendors, through radio spots in Florida, and television spots in Michigan.

- *In-store advertising* - [Save-A-Lot] develops general and point of sale signs to promote the private label brands, including products sold by Alliance vendors.

- *Brand consolidation* - Through careful research and analysis of consumer trends and preferences, [Save-A-Lot] has added new brands and consolidated others in order to maximize private label sales including products sold by Alliance's vendors.

- *Merchandise Mindset meetings* - [Save-A-Lot] conducts weekly meetings with all [Save-A-Lot] senior operations and marketing staff to review performance on past promotions, discuss current promotions, and suggest future promotions.  These meetings include Alliance personnel in addition to [Save-A-Lot].  Alliance is the only food broker that participates in these meetings, and as such has the ability to advocate for the products sold by its vendors.

- *[Save-A-Lot] meeting with Alliance vendors* - Periodically, Alliance vendors have the opportunity to meet directly with senior marketing and merchandising personnel of [Save-A-Lot] to discuss their products and provide direct input on potential new products, trends in the industry, suggestions on how to grow their business, and ideas on how to promote and advertise their products.

- *Promotion through social networking* - [Save-A-Lot] has developed a Facebook page to advertise and promote private label products, including those sold by Alliance's vendors, using the social network on

the internet. In the Pacific Northwest these efforts have been a resounding success based on [customer] responses. To determine if this test would work in other markets, [Save-A-Lot] tested this in a small town of South Carolina where one of its stores is located, noting that 500 people out of a population of 4,000 responded to a free giveaway during a two-hour window. As a result, [Save-A-Lot] is expanding this in order to maximize the promotion of its private label brands, including products sold by Alliance vendors. In addition, [Save-A-Lot] has used the social networking sites to distribute coupons.

• *Targeted Marketing Campaigns for Private Label* [- Save-A-Lot] has robust campaigns to market its private label products to its customers. As part of its "consumer centric" approach, [Save-A-Lot] focuses on satisfying anticipated demand with the proper bundling of products. One way this is accomplished is by creating various recipes calling for private label products and titled under such catch phrases as "Fuel Your Family" and "Love our Brands." These campaigns are then actively marketed by [Save-A-Lot] through the ad circulars, newspaper advertisements, in-store promotional material, end cap placement, etc.

(Id. at ¶ 49, quoting Ex. 20, the Expert Report of Scott A. Stringer at 5-7 (one footnote omitted) [Doc. 165 quoting Doc. 165-23].)

Section 2(c) of the Robinson-Patman Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c). In **F.T.C. v. Henry Broch & Co.**, 363 U.S. 166 (1960) ("**Broch**") (a price allowance or discount case involving a vendor's broker), the United States Supreme Court addressed this statutory provision. In that case, the broker had reduced its commission

- 15 -

so one of its vendors could make sales to a particular buyer at the reduced price that the buyer required. **Id.** at 168. The Federal Trade Commission (FTC) entered a cease and desist order against the broker on the grounds the broker violated 15 U.S.C. § 13(c). **Id.** In reviewing the order, the Supreme Court considered the purpose of the Robinson-Patman Act, stating

> The Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power. A lengthy investigation revealed that large chain buyers were obtaining competitive advantages in several ways other than direct price[] concessions and were thus avoiding the impact of the Clayton Act. One of the favorite means of obtaining an indirect price concession was by setting up "dummy" brokers who were employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the [vendor] pay "brokerage" to these fictitious brokers who then turned it over to their employer [the buyer]. This practice was one of the chief targets of § 2(c) of the Act. But it was not the only means by which the brokerage function was abused and Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination.

**Id.** at 168-69 (footnotes omitted);[17] see also **Ideal Plumbing Co. v. Benco, Inc.**, 529 F.2d 972, 976-77, 978 n.6 (8th Cir. 1976) (not addressing the "services rendered" exception but noting the purpose and history of 15 U.S.C. § 13(c) in a case arising out of a general contractor's acceptance of a bid lowered by a subcontractor upon the general contractor's agreement to do some of the work and finding no brokerage-related compensation at issue

---

[17] Halls Sales urges "Alliance is a buyer's broker under Save-A-Lot's control . . . but the determination as to who Alliance is an agent of is not necessary for this motion." (Halls Sales's Mem. Supp. Mot. Partial Summ. J. at 10 n.7 [Doc. 164].) Because it is Halls Sales's position that it is not necessary to decide for whom Alliance is an agent to resolve the motion for partial summary judgment, the Court will not further address this issue at this time.

in the case). The Supreme Court in **Broch** also found that the "particular evil at which § 2(c) is aimed can be as easily perpetrated by a [vendor's] broker as by the [vendor itself]. . . . " and that vendor's and buyer's brokers were clearly covered by 15 U.S.C. § 13(c). **Broch**, 363 U.S. at 170.

Prior to the **Broch** decision, courts had concluded that the statutory "services rendered" exception did not apply when a buyer provided services to a vendor or vice versa, but that it applied only when services were provided between a buyer and its broker or a vendor and its broker. See, e.g., **Quality Bakers of Am. v. F.T.C.**, 114 F.2d 393, 398 (1st Cir. 1940) ("the paragraph [15 U.S.C. § 13(c)], taken as a whole, is framed to prohibit the payment of brokerage in any guise by one party to the other, or the other's agent, a[t] the same time expressly recognizing and saving the right of either party to pay [its] own agent for services rendered in connection with the sale or purchase").

In **Broch**, the United States Supreme Court noted that the case before it had "no evidence that the buyer rendered any services to the [vendor] or to the respondent [vendor's broker] . . . . We would have quite a different case if there were such evidence and we need not explore the applicability of [15 U.S.C. § 13(c)] to such circumstances." **Broch**, 363 U.S. at 173. This language indicates a court may consider, as "services rendered" within the meaning of 15 U.S.C. § 13(c), those services that a buyer renders to a vendor or its broker.

Subsequently, the United States Court of Appeals for the Eighth Circuit found the "services rendered" exception was satisfied by the rendering of "valuable services" that are

"not de minimis." **Burge v. Bryant Pub. Sch. Dist. of Saline County**, 658 F.2d 611 (8th Cir. 1981) (per curiam) ("**Burge**").  In that case, the plaintiff challenged as constituting, in relevant part, a violation of § 2(c) of the Robinson-Patman Act commissions and gratuitous photographic services a school district photographer was required to provide the defendant public school district for taking pictures of the district's students.  **Burge v. Bryant Pub. Sch. Dist. of Saline County**, 520 F. Supp. 328, 333, 330 (E.D. Ark. 1980), aff'd, 658 F.2d 611 (8th Cir. 1981) (per curiam).  The United States District Court for the Eastern District of Arkansas found, based on an uncontroverted affidavit of the school district superintendent, that the district did "perform certain services for the photographer; namely, assisting in organizing the photography shooting schedule, assist[ing] in bookkeeping, assist[ing] in collecti[ng] . . . monies, and assist[ing] in setting up studio space." **Id.** at 333.  The court concluded "these are valuable services rendered by the school district and are of great benefit to the photographer." **Id.**  The district court granted the defendants' motions for summary judgment because there were no genuine issues of material fact and "the transaction [wa]s exempt from the proscriptions of the Robinson-Patman Act, specifically 15 U.S.C. § 13(c)[,] in that services [we]re rendered by the defendant district in exchange for the ten percent commission received." **Id.**

Although the trial court opinion had resolved the parties' motions for summary judgment on several grounds, the Eighth Circuit limited its affirmance to the determination that the services provided by the school district for the photographer were "services

- 18 -

rendered" for purposes of the exception in § 2(c) of the Robinson-Patman Act. **Burge.** 658 F.2d at 612. In particular, the Eighth Circuit found "[t]here [wa]s no genuine issue of material fact as to whether services were rendered by the [school district] in exchange for the commission it received"; and concluded

> [t]he school district rendered valuable services to the photographer in connection with the sale and purchase of the photographs that were taken. The services, including the provision of space in which photographs of students could be taken and the use of school employees to schedule the students for their sittings, were not de minimis.

**Id.** Accord **Stephen Jay Photography, Ltd. v. Olan Mills, Inc.**, 713 F.Supp. 937, 942-43 (E.D. Va. 1989), aff'd on other grounds, 903 F.2d 988 (4th Cir. 1990).

Based on **Broch** and **Burge**, this Court concludes that the "services rendered" exception in § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), may encompass services rendered by a buyer to a vendor or the vendor's agent, or vice versa. Under the circumstances here, that means that the services Save-A-Lot, the buyer, provides for Alliance's vendors in exchange for the portion of the commissions paid to Save-A-Lot by Alliance are not, as a matter of law, outside the "services rendered" exception in 15 U.S.C. § 13(c).

This conclusion is supported by a New Jersey decision denying, after a non-jury trial, a tortious interference claim based, in part, on a violation of Section 2(c) of the Robinson-Patman Act arising out of a similar business arrangement in which a broker shared its commissions with a buyer for promotional, marketing, or advertising services rendered by

the buyer.[18]  **Private Label Brokers Group v. Wakefern Food Corp.**, No. UNN C 34-95

(N. J. Super. Ct. Ch. Div. Oct. 21, 1996) (unpublished transcript of oral decision after non-

jury trial) ("**Wakefern**"), aff'd, No. A-1972-96T5 (N. J. Super. Ct. App. Div. Apr. 29, 1998)

(unpublished per curiam opinion).[19]  In that case, the plaintiff Private Label Brokers Group

(PLBG), an association of nine brokers for about forty vendors conducting business with the

buyer, Wakefern Food Corporation (Wakefern), a retailer-owned cooperative of Shop-Rite

supermarkets, sought to prevent Wakefern from dealing with Marketing Management, Inc.

(MMI), a broker in the sale of private label food and grocery products.  **Wakefern**, No. UNN

C 34-95, oral decision at 5, 6.  Specifically, PLBG challenged the designation of MMI as

Wakefern's preferred broker and "MMI's agreement with Wakefern to purchase professional

marketing services to promote Wakefern's private Shop-Rite label."  **Id.** at 7.  PLBG alleged,

in relevant part, that the defendants' agreement was unlawful and that MMI's solicitation of

PLBG's vendors constituted tortious interference with PLBG's prospective economic

relationships.  **Id.** at 7, 13.  Five of the forty vendors represented by PLBG switched to MMI.

**Id.** at 16, 19.  The trial court rejected PLBG's contention that the defendants' agreement for

---

[18]  The parties also discuss **Calk v. Albertson's, Inc.**, Civil Action No. SA-93-CA-405 (W.D. Tex. Sept. 27, 1995), as relevant to the issues before this Court.  (See, e.g., copy at Ex. C to Alliance's Mem. Oppos. Halls Sales's Mot. Partial Summ. J. [Doc. 204-3])  While similar issues and circumstances were addressed in that citation, it is a United States Magistrate Judge's Report and Recommendation and there is no indication of record that the Report and Recommendation was adopted by a United States District Court.  Therefore, the Court will not further discuss that citation.

[19]  These decisions are available at Ex. A attached to Save-A-Lot's Reply Supp. Mot. Summ. J. Against Halls Sales (Doc. 289-1).

the payment of commissions by MMI to Wakefern violated § 2(c) of the Robinson-Patman Act and was therefore unlawful.  **Id.** at 23, 26-31.  The trial court stated

> It is clear that courts throughout the country have ruled [after Broch, 363 U.S. at 173,] that if valuable services are rendered, it is not a violation of Section 2(c) [of the Robinson-Patman Act].  See Thurman Indus., Inc. v. Pay 'n Pak Stores, Inc., 709 F. Supp. 985 (W.D. Wash. 1987)[, abrogated as to the breadth of the "in commerce" requirement of § 2(c) by Rotec Indus., Inc. v. Mitsubishi Corp., 348 F.3d 1116, 1121 n. 2 (9th Cir. 2003)]; Calk v. Albertson's, Inc., Civ. No. SA-93-Ca-405, slip opinion [of United States Magistrate Judge's Report and Recommendation] (W.D. Tex. Sept. 27, 1995).

**Id.** at 26.  For a buyer's services to satisfy the "services rendered" provision of 15 U.S.C. § 13(c) the trial court concluded the services needed to be valuable services for the benefit of the vendor, and did not need to be services "over and above that which [are] usually rendered on" the part of the buyer "for [its] own account," as had been required in **F.T.C. v. Washington Fish & Oyster Co.**, 282 F.2d 595, 598 (9th Cir. 1960).  **Id.** at 27.  The New Jersey court considered the specifics of the parties' agreement for MMI's payment of commissions to Wakefern for Wakefern's "merchandise, advertising, and professional services to facilitate the sale of store brand products of" MMI's vendors;[20] found in particular

---

[20]  Specifically, the court found, with respect to the defendants' agreement regarding the payment of commissions by MMI to Wakefern, that

> [t]he marketing development fund which was set forth in the initial agreement between Wakefern and MMI places a pool of money available to Wakefern only to the extent that Wakefern qualifies and earns the money by performing services to promote the sales of private label products sold by the [vendors] represented by MMI.

> While the specific schedule attached to the agreement commits MMI to placing a percentage of the commissions into a pool based upon the amount of sales brokered by MMI to Wakefern, that being if MMI brokers 50 million or more sales to Wakefern it will place money equal to 70 percent of the commissions into the pool.

that certain advertising services provided by Wakefern satisfied both the "services rendered" test for the benefit of vendors as set forth in **Broch**, supra, and the "over and above" test set forth in **Washington Fish & Oyster Co.**, supra;[21] and concluded that the payments made by MMI to Wakefern did not violate 15 U.S.C. § 13(c).  See **id.** at 27-31.

Halls Sales urges this Court to find, to the contrary, that it is not legal under § 2(c) of the Robinson-Patman Act for a buyer, such as Save-A-Lot, to be paid brokerage commissions for services the buyer renders to a vendor, citing **Southgate Brokerage Co. v. F.T.C.**, 150 F.2d 607 (4th Cir. 1945) ("**Southgate**").  In **Southgate** the United States Court of Appeals

---

It is understood, and the court finds, that Wakefern does not automatically receive any of the money placed in the marketing development fund pool.  There is  no guarantee of any payment to Wakefern and the pool represents only the maximum amount which Wakefern may earn by providing certain services and functions, including but not limited to merchandise, advertising and professional services to facilitate the sale of store brand products of [vendors] represented by MMI.  Once Wakefern performs such services, [it] must submit documentary evidence to MMI in order for MMI to review the same and determine what services rendered [by Wakefern] were performed on behalf of [vendors'] products that were represented by MMI.

**Private Label Brokers Group v. Wakefern Food Corp.**, No. UNN C 34-95, oral decision at 27-28 (N. J. Super. Ct. Ch. Div. Oct. 21, 1996) (unpublished transcript of oral decision after non-jury trial), aff'd, No. A-1972-96T5 (N. J. Super. Ct. App. Div. Apr. 29, 1998) (unpublished per curiam opinion).

[21]   This finding pertained to a special multi-media advertising campaign conducted by Wakefern, called "The Amazing Truth About Shop-Rite Private Labels" ("Amazing Truth" ad campaign), to increase sales of its private label products.  **Private Label Brokers Group v. Wakefern Food Corp.**, No. UNN C 34-95, oral decision at 28-31 (N. J. Super. Ct. Ch. Div. Oct. 21, 1996) (unpublished transcript of oral decision after non-jury trial), aff'd, No. A-1972-96T5 (N. J. Super. Ct. App. Div. Apr. 29, 1998) (unpublished per curiam opinion).  On Wakefern's invoice of $1.8 million for its "Amazing Truth" ad campaign MMI paid "approximately $200,000 for those services that correspond to the products manufactured by MMI [vendors]" because MMI represented only 25% of the vendors selling to Wakefern.  **Id.** at 30.

for the Fourth Circuit enforced an FTC order directing Southgate Brokerage Company (Company) to stop accepting brokerage commissions and other financial benefits on purchases made for its own account. **Id.** at 608. This order was directed to the part of the Company's business that involved buying products from vendors which the Company subsequently sold to its customers[22] or, in other words, the part of its business it conducted as a buyer. **Id.** In addition to seeking review of the FTC's cease and desist order, the Company asked to be allowed to adduce evidence that had been rejected by the FTC "to the effect that it had rendered services to the [vendors] in connection with . . . purchases for which it claims to be entitled to compensation." **Id.** The Fourth Circuit concluded that the evidence was properly excluded and the FTC's cease and desist order was proper, because it was "perfectly clear that [15 U.S.C. § 13(c)] forbids the payment of brokerage on a sale or purchase of goods to the other party to the transaction." **Id.** at 609.

Because **Southgate** was decided in 1945 when case law precluded the payment of brokerage to the other party to a transaction and before the Supreme Court's 1960 decision in **Broch**, which allows consideration under the statute of services rendered by the other party to a transaction, this Court is not persuaded that the Fourth Circuit's decision requires this Court to conclude as a matter of law that Alliance's payments to Save-A-Lot are illegal under § 2(c) of the Robinson-Patman Act.

---

[22] The Company also engaged in a brokerage business and that part of its business was not the subject of the FTC's cease and desist order. **Southgate Brokerage Co. v. FTC**, 150 F.2d 607, 608 (4th Cir. 1945).

The question then is whether the services assumed to be provided to the vendors by Save-A-Lot for purposes of this motion may constitute "services rendered" under the statute.[23]  Based on the foregoing, the Court concludes that they may if they are valuable to the vendors and are not de minimis.  See **Broch**, 363 U.S. at 173; **Burge**, 658 F.2d at 612.

For its argument that Save-A-Lot's advertising and promotional services for vendors do not qualify for the "services rendered" exception in 15 U.S.C. § 13(c), Halls Sales relies on the **Southgate** court's rejection of the application of the statutory exception to the types of services for which the Company sought brokerage payments.  **Southgate**, 150 F.2d at 610, 611.  The services the Company sought to introduce as evidence were "services consisting of 'promoting, offering for sale, selling, ordering, receiving, adjusting shortage or damage claims, handling, warehousing, distributing, invoicing, collecting, [and] assumption of credit risks.'"  **Id.** at 608-09.  The Fourth Circuit concluded

> The services which the [C]ompany proposes to show by the evidence that was excluded are services rendered to itself, as [buyer], owner and subsequent seller of the goods purchased, and not to [the vendors].  It is immaterial that [the vendors] are benefit[t]ed by the fact that the [C]ompany purchases from them the goods which it subsequently resells.  The crucial fact is that all of the services upon which it relies are services rendered in connection with its own purchase, ownership or resale of the goods; and these services it renders, not to [the vendors], but to itself.

\*     \*     \*

_____

[23]  Halls Sales is not contesting the amount Alliance collects from the vendors but contends it is unlawful for Alliance to pay a substantial portion of its commissions to Save-A-Lot for services Save-A-Lot provides the vendors.  (Pl. Halls Sales's Reply to Mot. Summ. J. Against Defendants at 11 [Doc. 270].)

. . . [The Company's] position is that in acting as a distributor of the products of the [vendors], the [C]ompany performs for them the service of a broker and is entitled to the compensation of a broker. The fact is, however, that the [C]ompany is not a broker but a [buyer] with respect to the goods that it purchases for its own account. In selling these goods to others it acts, not for [the vendors], but for itself. Any profits due to rise in the market belong to it and any losses, whether from decline in the market or other cause, fall upon it. It sells for itself, to whom it pleases and at prices which it determines. The fact that it purchases from the [vendors] is doubtless beneficial to them and may enable them to dispense with the services of a broker on such transactions; but this does not mean that it has rendered services to them within any fair meaning of that language as used in [15 U.S.C. § 13(c)].

For [vendors] to pay [buyers] for purchasing, warehousing or reselling the goods purchased is to pay them for doing their own work, and is a mere gratuity.

**Id.** at 610-11. Cf. **Washington Fish & Oyster Co.**, 282 F.2d at 597 and 597 n.4 (discussing a price allowance or discount for a buyer's promotional services on behalf of the vendor and noting such an allowance or discount may not be unlawful under 15 U.S.C. § 13(c) if the services are not "merely incidental" and, based on **Southgate**, supra, are not those "a buyer normally performs for [it]self").

The Eighth Circuit, however, does not focus on who usually provides the rendered services, i.e., whether or not the provided services are normally performed by the person or entity rendering the services. Instead, the Eighth Circuit focuses on the value of those services to the person or entity paying for the services, and on whether or not those services are de minimis. In **Burge**, the Eighth Circuit found the school district had "rendered valuable services to the photographer," the vendor in that case, that were not de minimis. **Burge**, 658 F.2d at 612. The Court did not address whether or not the services provided to

the photographer were normally performed by the school district, an analysis that would comport with the **Southgate** view of "services rendered." Without further clarification from the Eighth Circuit, this Court will not change the focus of the "services rendered" analysis from the perspective of the person or entity paying for the services, here, the vendors, to the perspective of the person or entity providing the services, here, the buyer, Save-A-Lot.

Under the circumstances, Save-A-Lot's receipt of commissions from Alliance for the assumed services Save-A-Lot provides for Alliance's plain label vendors does not violate 15 U.S.C. § 13(c) so long as the provided services are valuable to the vendors and are not de minimis. See **Wakefern**, supra (finding commission payments to the buyer for promotional and advertising services it provided to plain label vendors did not violate 15 U.S.C. § 13(c)); cf. **Mississippi Petroleum, Inc. v. Vermont Gas Sys.**, Civil No. 4503, 1972 WL 527, at * 5 (S. D. Miss. Jan. 25, 1972) (unpublished decision) (finding a one-cent per gallon discount in the price of a gallon of gas provided to a vendor's own gas stations, and not provided to the non-vendor plaintiff gas station owner, satisfied the "services rendered" provision of 15 U.S.C. § 13(c) based on testimony that the reduction in price "was the value of advertising and other sales promotional services offered to [the vendor's] own stations").

Halls Sales also argues that Save-A-Lot's services may not be compensated through the commissions because the commissions are received for services provided by Save-A-Lot after Save-A-Lot purchases the items from the vendors.[24] While neither **Broch**, supra, nor

---

[24] Halls Sales argues that the Supreme Court's reference to services in **Broch**, 363 U.S. at 173, is limited to services provided during the vendor's sale to the buyer only. (Pl. Halls Sales's Reply

**Burge**, supra, addressed the type of business arrangement specifically presented by the circumstances of this case, the Court is not convinced that those cases preclude the application of their principles to the situation here, particularly in view of the instructive

---

Supp. Mot. Partial Summ. J. at 7-10 [Doc 270].)  This Court does not agree.  Although the Court in **Broch** noted that it was being asked to distinguish precedents

> on the ground that there is no claim by the present buyer that the price reduction, concededly based in part on a saving to the [vendor] of a part of [its] regular brokerage cost on the particular sale, was justified by the elimination of services normally performed by the [vendor] or [its] broker[,]

the Court found no evidence of "any services" being rendered by the buyer to the vendor or its broker.  **Broch**, 363 U.S. at 173.  Therefore, the Supreme Court did not have the opportunity to address any type of services provided by a buyer to a vendor or its broker, and the relevant language in that case does not preclude this Court from considering a buyer's services in advertising or promoting a vendor's products as "services rendered" under 15 U.S.C. § 13(c).  See **Wakefern**, supra.

Halls Sales also argues that only services reducing "distribution costs" can satisfy the "services rendered" provision of 15 U.S.C. § 13(c).  (Pl. Halls Sales's Reply Supp. Mot. Partial Summ. J. at 9 [Doc. 270].)  This is based on the Supreme Court's statement that "[o]ne thing is clear – the absence of such evidence and the absence of a claim that the rendition of services or savings in distribution costs justified the allowance does not support the view that [15 U.S.C. § 13(c)] has not been violated," **Broch**, 363 U.S. at 173-74.  To support Halls Sales's position about that statement requires rewriting the statement to read "the absence of a claim that the rendition of services in distribution costs justified the allowance . . ., " which does not make sense.  Rather, the Court's statement distinguishes between the "rendition of services" and "savings in distribution costs" as two separate ways to justify an allowance otherwise prohibited by 15 U.S.C. § 13(c).

Additionally, the Court does not agree with any implied or explicit argument by Halls Sales that **Broch** addressed the "reselling" discussion in **Southgate**.  Rather, **Broch** cited **Southgate** only twice.  Once for the proposition that **Southgate** was a court that had "rejected the contention that . . . a price reduction was lawful because the buyer[] . . . had saved the [vendor] the amount of [its] ordinary brokerage expense." **Broch**, 363 U.S. at 172, 172 n. 11.  The second time the Supreme Court in **Broch** cited **Southgate** was for the proposition that it followed another case in concluding "that [a] price reduction was an allowance in lieu of brokerage within the meaning of" 15 U.S.C. § 13(c).  **Id.** at 173, 173 n.13.  **Broch** did not discuss a buyer's reselling services or that aspect of the **Southgate** decision.

decision in **Wakefern**, supra, which addressed similar circumstances, and the **Burge** court's focus on the value of the rendered services to the entity paying the commissions, or here, the value of those services to Alliance's plain label vendors.

Halls Sales further urges permitting Defendants to engage in the conduct at issue here constitutes a judicial repeal of 15 U.S.C. § 13(c). This Court disagrees. The Court is not interpreting the statute to allow payments to a buyer when services are not rendered by the buyer to the vendors. The Court is also not interpreting the statute to permit payments to a buyer when the buyer's services for a vendor are not valuable or are de minimis. Rather, the Court interprets the "services rendered" provision in 15 U.S.C. § 13(c) as allowing the payment of commissions to a buyer for the payment of, or for the reimbursement of a buyer's payment of, advertising and promotional services that benefit its vendors when such services are shown to be valuable to the vendors and not de minimis.[25]

Therefore, the Court finds that Alliance's payment to Save-A-Lot of a portion of the commissions Alliance receives from its vendors, for services rendered by Save-A-Lot, does not violate § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), as a matter of law so long as those payments are for valuable services rendered by Save-A-Lot to the vendors and those services are not de minimis. This ruling does not address whether these "services rendered" requirements are satisfied with respect to any payment made by Alliance to Save-A-Lot, as

---

[25] Due to Halls Sales's observation that it "is not necessary to show price discrimination for a violation of" 15 U.S.C. § 13(c), the Court will not address Halls Sales's price discrimination argument. See Pl. Halls Sales's Mem. Supp. Its Mot. Partial Summ. J. at 4 [Doc. 164].)

such issues were not raised in the motion for partial summary judgment. Therefore, Hall Sales is not entitled to a determination that, as a matter of law under § 2(c) of the Robinson-Patman Act, Defendants' conduct is not justified for purposes of Hall Sales's tortious interference claim.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Halls Sales's motion for partial summary judgment (Doc. 163) is **DENIED**.


 /s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 21st day of September, 2010.