# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **SALES RESOURCE, INC., d/b/a/ RESOURCE ONE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:08cv0732 TCM** |
| | ) | |
| **ALLIANCE FOODS, INC. and MORAN FOODS, INC., d/b/a SAVE-A-LOT, LTD.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **HALLS SALES AND MARKETING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 4:09cv0666 TCM** |
| | ) | |
| **ALLIANCE FOODS, INC., and MORAN FOODS, INC., d/b/a SAVE-A-LOT, LTD.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

    This matter is before the Court[1] on two motions for summary judgment filed by

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

    All references to documents are to documents in Case No. 4:08cv0732 TCM except for references to the complaint filed by Halls Sales and Marketing, Inc., which is in Case No. 4:09cv0666

Defendant Alliance Foods, Inc., (Alliance) [Docs. 198 and 202] and two motions for summary judgment filed by Defendant Moran Foods, Inc., d/b/a Save-A-Lot, Ltd., (Save-A-Lot) [Docs. 209 and 210], with one of each Defendants' summary judgment motions filed against Plaintiff Sales Resource, Inc., d/b/a Resource One (Resource One) [Docs. 198 and 209] and one of each Defendants' summary judgment motions filed against Plaintiff Halls Sales and Marketing, Inc. (Halls Sales) [Docs. 202 and 210]. Also pending before the Court is Plaintiffs' joint motion for oral argument [Doc. 302].

By their pending complaints,[2] Plaintiffs, who are brokers for sales of private label grocery products[3] to Defendant Save-A-Lot, seek monetary and injunctive relief based on Defendants' allegedly tortious interference with Plaintiffs' business relationships and business expectancies, as well as Defendants' allegedly unfair competition. Plaintiffs allege that Defendants' September 2007 change in their business relationship adversely affected Plaintiffs' brokerage relationships with some of the manufacturers, suppliers, and processors

_____

TCM.

[2] These lawsuits were originally filed in the Circuit Court of St. Louis County, Missouri, and were subsequently removed to this Court. The Court consolidated these cases, with the agreement of the parties, for purposes of pretrial proceedings, reserving for a later time the decision whether to consolidate the cases for trial. [Doc. 143.] Earlier, the Court denied Alliance's motions to dismiss the complaints [Doc. 149], Halls Sales's motion for partial summary judgment [Doc. 304], Defendants' motions directed to Plaintiffs' expert witnesses [Doc. 305, Doc. 306], and Plaintiffs' motion to strike one of Defendants' expert witnesses [Doc. 307].

[3] A product referred to as "private label," "exclusive brand," or "store brand" carries the label of the store selling the item, here Save-A-Lot's label, and does not carry the label of a national branded product such as Coca Cola, Pepsi, Tide, or Ivory products.

(collectively vendors)[4] they represented, resulting in the termination of or change in those vendors' brokerage relationships with Plaintiffs. Specifically, after 2007, Plaintiff Resource One did not have the same broker relationship with ten vendors the Court will collectively refer to as Kroger Company/Inter-American Products (Kroger)[5] and was no longer the broker for Kahiki, Inc. (Kahiki); and Plaintiff Halls Sales no longer was the broker for four vendors, Baumer Foods, Inc. (Baumer), Liberty Gold Fruit Company (Liberty Gold), Malt-O-Meal Company (Malt-O-Meal), and Vista Bakery, Inc./Lance (Lance). After terminating the brokerage relationships they had had with Plaintiffs through 2007, all of these vendors, except Kroger, hired Alliance to represent them in their sales of private label products to Save-A-Lot. In their answers, Defendants deny the allegations, in large part, and set forth numerous affirmative defenses.

By their motions for summary judgment, Defendants contend they are entitled to entry of judgment in their favor on Plaintiffs' claims based on numerous grounds. By their joint

---

[4] The parties use various terms to refer to the entities involved in the sale of products to companies, like Save-A-Lot, that sell those products either to members of the public or to related businesses. For convenience, the Court will refer to the sellers of the products as vendors; will refer to those purchasing the products from the vendors, like Save-A-Lot, as buyers; and will refer to the purchasers of Save-A-Lot's items as customers, which reference includes members of the general public who purchase items at a Save-A-Lot corporate store and licensees who purchase items from Save-A-Lot for resale to members of the general public through a Save-A-Lot licensed store.

[5] The record also contains references to "IAP," which are references to Kroger. The ten vendors referred to as Kroger are: Centennial Farms Dairy, Delight Products, Heritage Farms Dairy, La Habra Bakery, Michigan Dairy, Riverside Dairy, Tamarack Farms Dairy, Tara Products, Vandervoort Dairy, and Winchester Farms Dairy. See, e.g., Pl. Resource One Second Am. Compl. ¶ 6 [Doc. 123]; Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Resource One, Ex. X [Doc. 201-24].)

motion for oral argument, Plaintiffs ask the Court to exercise its discretion and grant oral argument on the summary judgment motions.

## Background

The undisputed facts[6] reveal the following.  Plaintiffs Resource One and Halls Sales are brokers representing vendors in the sale of private label products to Save-A-Lot.

Halls Sales has been in business since 2001 and, in September 2007, represented nine vendors on sales of their products to Save-A-Lot only.  (See, e.g., Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶ 5 [Doc. 165].)  The business is owned by Gary Halls and has had up to two employees, one of whom is Gary Halls.  (Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 21 [Doc. 216].)  Halls Sales began representing Baumer Foods on June 8, 2001, Lance on June 8, 2001,  Liberty Gold on October 15, 2003, and Malt-O-Meal on June 6, 2001, for their sales to Save-A-Lot.  (Def. Alliance Exs. Supp.  Mot. Summ. J. against Pl. Halls Sales, Ex. W [Doc. 205-23].)  If the Halls Sales' agreements specified a period for notice of termination, they specified a thirty-day notice period.  (See, e.g., Pls. Exs. Supp. Pls. Resp. Defs.' Mots. Summ. J., Ex. 17  [Doc. 270-80].)

Plaintiff Resource One is a broker of private label products to Save-A-Lot, among

---

[6]  The undisputed facts set forth by the Court are from the allegations in Resource One's second amended complaint and Halls Sales's complaint to the extent they are admitted by Defendants in their Answers; from statements in the parties' statements of undisputed material facts supporting their summary judgment motions to the extent they are admitted by the opposing party or parties; and from the uncontradicted record.

other buyers.[7]  Resource One began representing Kroger for its sales to Save-A-Lot in about 1988 and provided broker services to it pursuant to various agreements with varying terms.[8] Then Resource One and Kroger entered into three broker services agreements, dated November 2, 2006, and January 25, 2007, each containing identical provisions regarding their terms and permitting their termination upon one year's notice.[9]  On April 1, 2007, pursuant to a contract that provided for at least thirty days notice of termination, Plaintiff Resource One began representing Kahiki for its sales of items other than private label products to Save-A-Lot.[10]

Defendant Alliance is a broker competing with Plaintiffs in the sale of vendors' private label products to Save-A-Lot.[11]  During 1978, Save-A-Lot's first year in business, Alliance

---

[7] Def. Alliance's Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 26 [Doc. 201].

[8] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 57 [Doc. 215].

[9] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 61, 62 [Doc. 215].

The relevant identical provisions in the three agreements stated: "This Agreement will remain in effect for an initial term of 12 months after the Effective Date and will automatically renew for consecutive 12 month renewal terms.  Either party may terminate this Agreement during the initial term or any renewal term upon 12 months written notice of the other."  Id. ¶ 62.

[10] Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Resource One,  Ex. P Addendum B [Doc. 201-16].

Resource One began representing Kahiki with respect to other buyers on September 11, 2006. (Id., Ex. P [Doc. 201-16].)

[11] Pl. Resource One Second Am. Compl. ¶ 11 [Doc. 123]; Pl. Halls Sales Compl.  ¶ 11 [Doc. 1-3]; Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 19

began representing vendors in their sales to Save-A-Lot ; has represented vendors to Save-A-Lot exclusively since about the mid-1990's; and now represents over 150 active vendors in their sales of private label and other products to Save-A-Lot.[12] Alliance also owns fifteen Save-A-Lot retail stores as licensee.[13]

Defendant Save-A-Lot is an "extreme value" or "limited assortment" grocer buying primarily private label products from vendors and selling those private label and other products in retail stores and as a wholesaler to its licensed stores.[14]

Originally, Save-A-Lot came to the market as a product-centered retailer focusing on buying products for the least expensive price and, in turn, selling them to its customers. In 2007, Save-A-Lot changed its go to market strategy adopting a consumer-centric approach focusing on its customers and the products that they needed and wanted. That change was revolutionary for Save-A-Lot although other grocery retailers had already made that change. As part of the change, Save-A-Lot entered into a strategic relationship with Alliance under which Alliance for the benefit of its vendors agreed to help Save-A-Lot achieve its goal by helping to better understand the wants and needs of its customers, to better merchandise and market products at the stores,

---

[Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶ 19 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶ 26 [Doc. 214]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 26 [Doc. 215].

[12] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 21, 22, 23 [Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 21, 22, 23 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 28 [Doc. 215].

[13] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 24 [Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶ 24 [Doc. 205].

[14] Def. Save-A-Lot Statems. Uncontr. Mat. Facts Supp. Mot. Summ. J. against each Pl. ¶ 1 [Docs. 214 and 215]; Pl. Halls Sales's Statem. Uncontr. Mat. Facts ¶¶ 1, 2 [Doc. 165].

and to better promote and advertise products to its customers.

(Def. Save-A-Lot Statems. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶ 2 and against Pl. Resource One ¶ 2,3,4 [Docs. 214 and 215, respectively].)[15]

By the end of September 2007,[16] Defendants Alliance and Save-A-Lot entered into a business arrangement that was effective in January 2008, which, in relevant part, supported vendors' use of Alliance as broker on sales of products to Save-A-Lot and provided for Alliance's payment to Save-A-Lot of a percentage of the commissions Alliance received from vendors on those sales to Save-A-Lot.[17] Starting in 2008 Alliance reported that it considered

---

[15] To support these statements of fact, Save-A-Lot relies on testimony of Bill Shaner, its President and CEO, with respect to Plaintiff Halls Sales [see Doc. 214 ¶ 2], and on its expert William Bishop's report with respect to Plaintiff Resource One [see Doc. 215 ¶ 2, 3, 4]. With respect to the Shaner reference supporting the statement of fact as to Halls Sales, the statement of fact is not a direct quote of Shaner. (To see the Shaner deposition testimony cited by Save-A-Lot in support of paragraph 2 in its statements of facts, except for page 189 of the deposition which the Court is unable to locate in the available summary judgment record, see the Shaner Deposition excerpts at Doc. 231-3.) Halls Sales, however, admits that Shaner testified as stated in the statement of fact, and the Court has, therefore, quoted the statement of fact.

While Halls Sales admits Shaner testified as noted, Halls Sales states "the relationship [Save-A-Lot had] with Alliance was entered into as set forth in" paragraphs 19 through 39 of Halls Sales's Statement of Facts [Doc. 165]. (Pl. Halls Sales's Resp. to Save-A-Lot's Statem. Add'l Uncontr. Mat. Facts ¶ 2 [Doc. 271].) Those paragraphs address the period from early 2007 to early September 2007, when Save-A-Lot was considering Alliance and another broker and then selected Alliance as the broker for this new business focus or project of Save-A-Lot. (Pl. Halls Sales's Statem. Uncontr. Mat. Facts regarding Pl. Mot. for Partial Summ. J. ¶¶ 19-39 [Doc. 165].)

[16] Prior to September 28, 2007, Alliance and Save-A-Lot had a business arrangement that was effective until January 1, 2008, but the claims in this case focus on Plaintiffs' loss of vendors by early 2008 as a result of the change in Defendants' business arrangement as announced in late September 2007. See, e.g., Pl. Resource One Second Am. Compl. ¶¶ 7, 12, 17-31 [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 6, 12, 17-31 [Doc. 1-3].

[17] See Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 27, 29, 32 [Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against

a portion of the commissions it received from vendors as payments for merchandising personnel and for advertising by Save-A-Lot.[18]  The actual purpose and use of Alliance's payments to Save-A-Lot is in dispute.

In support of this business arrangement between Defendants, Bill Shaner, the President and CEO of Save-A-Lot, sent a letter to vendors which stated in full:

> To Our Valued Exclusive Brand Product Suppliers:
>
> During the past several months, Save-A-Lot has undertaken a thorough analysis of our [private label] product program to determine the most effective way to market what we believe is one of our most important strategic and competitive advantages.  As you know, our number one priority is to offer our customers exceptional quality products at unbelievable value.  The foundation and strength of the Save-A-Lot format relies heavily on the acceptance and success of our [private label products].
>
> As one of our [private label] product [vendors], we consider you a vital component to the success of this program, and to the extent we are successful, you in turn will be successful in expanding your distribution and sales.  Our analysis has identified several opportunities to enhance the merchandising, marketing[,] and sales of our [private label products] and at the same time to become more customer focused and deepen our understanding of our customer[s'] wants and needs.
>
> In order to reinforce our efforts and focus in this regard, we have selected Alliance Foods, Inc. as a primary strategic resource and merchandising and marketing partner to help us expand and further develop our [private label

Pl. Halls Sales ¶¶ 26, 28, 31 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 2, 29, 30, 32, 33, 34, 48 [Doc. 214]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 4, 30, 31, 34, 51 [Doc. 215].

[18] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 32 and 33 [Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 31, 32 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 28 [Doc. 215]; Def. Alliance Exs. Supp. Mot. Summ. J. against Resource One, Ex.S [Doc. 201-19].

product] program. Save-A-Lot and Alliance will immediately begin work on new initiatives to enhance Save-A-Lot's [private label] product program, with an expectation of full implementation effective January 1, 2008. We believe our relationship with Alliance will benefit our respective businesses by increasing sales of Save-A-Lot [private label] products and that Alliance's services will complement our plans for our [private label] product program.

Alliance has 82 years of experience in the food industry, working with large regional and national companies in the development of private label [product] programs. We have asked representatives of Alliance to contact you to explain our initiative. While we certainly are not requiring our [private label] product [vendors] to work with Alliance, to the extent you are contractually free to do so, we would encourage you to consider the services Alliance offers in marketing and merchandising the [private label] Save-A-Lot products you supply.

We look forward to working with you and implementing all facets of this exciting initiative. Should you have any questions, please contact Steve H Harris, Senior Vice-President, Merchandising at Save-A-Lot . . . .

Sincerely,

Moran Foods, Inc., d/b/a Save-A-Lot, Ltd.

Bill Shaner
President & CEO

Letter, dated September 28, 2007.[19]

After this letter, Alliance contacted some vendors to discuss the services available

from Alliance, and Save-A-Lot contacted some vendors about meeting with Alliance.[20] Save-

---

[19] Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Resource One, Ex. Q [Doc. 201-17]; Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Halls Sales, Ex. O [Doc. 205-15]; Def. Save-A-Lot Exs. Supp. Mot. Summ. J. against Pl. Halls Sales, Ex. 17 [Doc. 225-6]; Def. Save-A-Lot Exs. Supp. Mot. Summ. J. against Pl. Resource One, Ex. 35 [Doc. 223-5].

[20] Pl. Resource One Second Am. Compl. ¶¶ 18, 19, 47(c) [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 18, 19, 39(c) [Doc. 1-3].

A-Lot's representatives met with various vendors on several occasions, including at the Private Label Manufacturers' Association (PLMA) meeting in November 2007[21] and at a meeting in St. Louis on December 17, 2007.[22] During the latter meeting, Save-A-Lot stated it believed its relationship with Alliance should increase sales and profits and benefit the vendors, and reported that Alliance was hiring employees to call on Save-A-Lot stores to promote the sales of private label products made by the vendors.[23]

As part of this effort to get private label product vendors to choose Alliance, Defendants met regularly, and created a document which listed vendors who had appointed Alliance as their broker, vendors who had not yet made a decision about appointing Alliance, and vendors who had decided not to appoint Alliance as their vendor, using the colors green, yellow, and red, respectively, to indicate the status of the vendors' decisions to appoint Alliance.[24]

By April 2008 Kahiki had terminated Resource One and hired Alliance as its broker for sales to Save-A-Lot, while Baumer Foods, Liberty Gold, Malt-O-Meal, and Lance had

---

[21] Pl. Resource One Second Am. Compl. ¶¶ 26, 49 [Doc. 123]; Pl. Halls Sales Compl. ¶ 41 [Doc. 1-3].

[22] Pl. Resource One Second Am. Compl. ¶ 47(d) [Doc. 123]; Pl. Halls Sales Compl. ¶ 41 [Doc. 1-3]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 2 [Doc. 215].

[23] Pl. Resource One Second Am. Compl. Id. ¶¶ 47(e), 47(g); Pl. Halls Sales Compl. ¶¶ 39(g), 41 [Doc. 1-3].

[24] See, e.g., Pl. Resource One Second Am. Compl. ¶¶ 21, 23, 52 [Doc. 123]; Pl. Halls Sales Compl. ¶ 23 [Doc. 1-3].

terminated Halls Sales and hired Alliance as their broker for sales to Save-A-Lot.[25]  Before

Halls Sales's vendors terminated Halls Sales and hired Alliance, they understood that Alliance

might represent the vendors' competitors.[26]  Those vendors' representatives also testified that

Alliance did not threaten, intimidate, or coerce them  before they decided to terminate Halls

Sales and hire Alliance.[27]  Additionally, before they appointed Alliance as their broker, Gary

Halls talked with Baumer Foods, Lance, and Liberty Gold suggesting to them or agreeing

---

[25] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 20, 48 [Doc. 201]; Def Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 20, 51, 52 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 27, 49 [Doc. 214];  Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 27, 52 [Doc. 215]; Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Resource One, Ex. M [Doc. 201-13]; Def. Alliance Exs. Supp. Mot. Summ. J. against Pl. Halls Sales, Ex. M [Doc. 205-13].

A different vendor, Coffee Holding, also terminated Halls Sales and appointed Alliance after receiving the September 28, 2007, letter, but then terminated Alliance and is not the subject of Plaintiffs' claims.  (Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 51, 52, 60 [Doc. 205].)

Another vendor, Tai Foong USA, Inc. (Tai Foong), terminated Resource One and hired Alliance as its broker after receipt of the September 28, 2007 letter, but subsequently terminated Alliance and is not the subject of Plaintiffs' claims.  (Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 49 [Doc. 201]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 52, 53 [Doc. 215]; Shogren Dep. at 324, Alliance's Exs. Supp. Mot. Summ. J. against Pl. Resource One, Ex. Z [Doc. 201-26].)

[26] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 55, 72, 77, 84, 86 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 55, 73, 80, 95 [Doc. 214].

[27] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 56, 63, 64, 68, 74, 78, 79 [Doc. 205]; Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 56, 59, 68, 87, 88  [Doc. 214].

with them that they should appoint Alliance.[28]

Kroger, which had previously used Plaintiff Resource One as its broker for sales to Save-A-Lot, did not engage Alliance as its broker,[29] but did change its broker relationship with Plaintiff Resource One with respect to sales to Save-A-Lot in 2008. Specifically, by letter dated December 5, 2007, Kroger advised Resource One that it was, in relevant part, terminating its broker relationship, effective December 5, 2008, with respect to sales to Save-A-Lot.[30] The parties dispute whether this notice was based on a decision within Kroger independent of Defendants' conduct or arose out of Defendants' conduct in the fall of 2007. In 2008, Kroger and Resource One entered, in part, into a "backroom services agreement" with respect to Save-A-Lot, which agreement contained a ninety-day period for notice of termination, rather than the one-year notice provision that was in their earlier agreements.[31] This "backroom services agreement" contains an integration clause stating that this agreement "supersede[s] and cancel[s] in their entirety" "[a]ll prior agreements, understandings, negotiations, or representations, whether oral or in writing, relating to the subject matter of

---

[28] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 54, 69 [Doc. 214].

[29] Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 69 [Doc. 201].

[30] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 64, 66 [Doc. 215].

[31] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 69, 70 [Doc. 215].

this Agreement."[32]

## Discussion

Evidentiary Objections.   Plaintiff Halls Sales objects to the reports of Defendants' experts,[33] Scott A. Stringer and William Bishop, on the ground those reports were not properly authenticated. Defendants filed those reports in support of their motions for summary judgment without accompanying affidavits or depositions providing the information necessary to allow the Court's consideration of the reports in resolving those motions. See, e.g., **DG & G, Inc. v. Flexsol Packaging Corp. of Pompano Beach**, 576 F.3d 820, 826 (8th Cir. 2009) ("'[t]o be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e)'" (quoting Shanklin v. Fitzgerald, 397 F.3d 596, 602 (8th Cir. 2005)).  With their reply briefs, however, Defendants provided Stringer's and Bishop's declarations that they had authored their previously submitted reports, and that those reports accurately detail the authoring expert's "qualifications, opinions, bases for [the expert's] opinions, and conclusions."[34]  Due to these subsequently filed declarations, the Court considers those experts' previously unsworn reports "cured," **id.**, and overrules these objections.

---

[32] Def. Save-A-Lot Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶ 70 [Doc. 215].

[33] See  Docs. 201-1, 205-1, 218-1, 218-2, 224-1, and 224-2.

[34] See Docs. 290-1, 290-2, 292-1, and 292-2.

- 13 -

Plaintiffs also object that exhibits S, T, U, and V supporting Alliance's summary judgment motion against Halls Sales, as well as the same exhibits marked as Q, R, S, and T supporting Alliance's summary judgment motion against Resource One, are not authenticated. The Court will consider those exhibits authenticated due to the affidavit of Sal Stazzone subsequently filed by Alliance.[35] There are authentication objections presented in opposition to certain other evidentiary materials and the Court will take those objections into consideration when considering the pertinent materials.

Defendant Alliance objects to several affidavits Plaintiffs filed in opposition to Alliance's summary judgment motions. Alliance objects that these affidavits contain hearsay and speculation or opinion testimony from lay witnesses, and therefore cannot be considered by the Court, citing **Cronquist v. City of Minneapolis**, 237 F.3d 920, 927 (8th Cir. 2001) (affidavits based on hearsay cannot defeat a motion for summary judgment) and **Kern v. Tri-State Ins. Co.**, 386 F.2d 754, 756 (8th Cir. 1967) (noting the district court "would have been within its rights in rejecting [an] affidavit as being pure speculation and not substantial evidence"). Specifically, Alliance objects to the affidavits of Ed Cuccio, the President of Resource One, and Dave Shogren, the Executive Vice President of Resource One throughout 2007 and until the present, as containing inadmissible hearsay and speculation; to paragraph 8 of the affidavit of William Boehm, the Senior Vice-President of Kroger and President of Kroger Manufacturing in 2007 until his retirement in the spring of 2008, to the extent it states

---

[35] See Ex. F to Alliance's Reply Br. [Doc. 286-6].

what Kroger was "unlikely" to do; and to paragraph 24 of Shogren's affidavit and paragraph 5 of the affidavit of Ken Berry as containing improper opinion testimony of fact witnesses.

While not disagreeing with the principles Alliance set forth in support of these objections, the Court will overrule the objections. The Court may consider Berry's opinion testimony regarding grocery industry practices and the treatment of branded versus private label products due to Berry's forty-five years of employment in the grocery industry, including twenty-three years with Kroger and five years with a "third-party in-store merchandising company" which in part performed services for Kroger's private label brands in Kroger stores.[36] Shogren's and Boehm's testimony may similarly be considered due to their experience in the grocery industry. "Personal knowledge or perceptions based on experience is a sufficient foundation for" lay witness opinion testimony admissible under Fed. R. Evid. 701. **In re Air Crash at Little Rock, Ark. on June 1, 1999**, 291 F.3d 503, 515 (8th Cir. 2002). In particular, "'perceptions based on industry experience [are] a sufficient foundation for lay opinion testimony.'" **US Salt, Inc. v. Broken Arrow, Inc.**, 563 F.3d 687, 690 (8th Cir. 2009) (quoting Burlington N. R. Co. v. Nebraska, 802 F.2d 994, 1004-05 (8th Cir. 1986)). Alliance's objections to Cuccio's and Shogren's affidavits are not specific as to which

---

[36] See Berry Aff. ¶¶ 1-2, 13-15 attached to Pls.' Resps. Defs.' Mots. Summ. J. [Doc. 270-1].

The Court notes that Berry was recently listed by Plaintiff Resource One as a rebuttal expert who may testify at trial, see Resource One's Notice of Witnesses [Doc. 253-1], and, if so, Defendants had an opportunity to depose him pursuant to this Court's October 28, 2010, order [Doc. 306].

portion(s) of the affidavits the objections apply. Those two affidavits contain non-hearsay statements, references to statements by Defendants' personnel, and statements of others that are not clearly included for the truth of the statements. Without more specificity, those objections are not clearly presented to the Court and will be overruled.

Save-A-Lot argues that, with respect to its summary judgment motion against Resource One,[37] the Court should not consider the testimony of Pat Ragusa, who had been Save-A-Lot's Vice President of Perishable Product Procurement from 1997 until early 2008, due to his friendship with Resource One's owner, his lack of familiarity with occurrences after he left Save-A-Lot in February 2008, and his lack of personal involvement with certain aspects of Defendants' business arrangement before he left Save-A-Lot. These and other objections of the parties to this and other evidentiary materials will be considered as necessary in resolving the summary judgment motions.

Summary judgment standard. Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the Court shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986) (quotation marks omitted) (quoting Rule 56(c) of the Federal Rules of Civil Procedure). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact

---

[37] This argument is set forth in Save-A-Lot's response to Resource One's response to Save-A-Lot's statement of uncontroverted facts [Doc. 292]. Save-A-Lot did not file a similar response to Halls Sales's response to Save-A-Lot's statement of uncontroverted facts.

is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman,** 953 F.2d 394, 395 (8th Cir. 1992) (quotation marks omitted) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

The initial burden is on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor.  <u>See</u> **Van Horn v. Best Buy Stores, L.P.,** 526 F.3d 1144, 1146 (8th Cir. 2008) ("the defendants met their initial burden of notifying the . . . court of the basis for their summary judgment motion and identifying the documents that they believed demonstrated the absence of a material fact").  After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts.  <u>See</u> **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986).  Instead, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial. **Anderson**, 477 U.S. at 249; **Palesch v. Missouri Comm'n on Human Rights**, 233 F.3d 560, 565-66 (8th Cir. 2000).  "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." **Webb v. Lawrence Cnty.**, 144 F.3d 1131, 1135 (8th Cir. 1998).  <u>See also</u> **Stanback v. Best Diversified Prods., Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the

non-moving party. See **Ghane v. West,** 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.,** 13 F.3d 264, 269 (8th Cir. 1993). Importantly, in resolving a motion for summary judgment, the Court does not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." **Morris v. City of Chillicothe**, 512 F.3d 1013, 1018 (8th Cir. 2008).

In a diversity action such as this, Missouri law applies to Plaintiffs' state claims of tortious interference and unfair competition. See **Praetorian Ins. Co. v. Site Inspection, LLC**, 604 F.3d 509, 510 (8th Cir. 2010) (noting that Missouri law controls in a diversity action filed in and appealed from the United States District Court for Western District of Missouri); **HealthEast Bethesda Hosp. v. United Commercial Travelers of America**, 596 F.3d 986, 987 (8th Cir. 2010) (in a diversity action, the court applies the substantive law of the forum state). This includes application of Missouri law regarding the proper burden of proof, **Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.,** 347 F.3d 1052, 1053 (8th Cir. 2003), and regarding the propriety of injunctive relief, **Kelly v. Golden**, 352 F.3d 344, 353 (8th Cir. 2003).

The Court will first address the summary judgment motions to the extent they focus on Plaintiffs' allegations that a civil conspiracy exists between Defendants rendering them both liable on Plaintiffs' tortious interference and unfair competition claims.

Civil Conspiracy Theory of Liability. For the civil conspiracy theory of liability, Plaintiffs allege that, by the end of September 2007, Defendants agreed to obtain

commissions from vendors; that Alliance agreed to pay Save-A-Lot a large portion of the commissions it received from vendors appointing it for their sales to Save-A-Lot and agreed to hire staff to perform services for Save-A-Lot in return for Save-A-Lot's agreement to contact vendors and use its buying power to get vendors to hire Alliance, and terminate Plaintiffs, as their broker; that Defendants entered into this "conspiratorial scheme knowing that the [vendors] would be intimidated by such a request from Save-A-Lot because they must please Save-A-Lot in order to sell products to it"; and that Alliance agreed to "split the commissions it received from [vendors] with Save-A-Lot in return for Save-A-Lot's coercion, intimidation and pressure on the [vendors] to . . . hire Alliance."[38]

Defendants argue they are entitled to summary judgment on the civil conspiracy allegations because there is no evidence that they had an unlawful objective or a meeting of the minds.   Plaintiffs contend that the conspiracy theory of liability makes Alliance liable for the acts of Save-A-Lot despite "Alliance's argument that it has not coerced, threatened or intimidated any of the vendors."

Pleading a civil conspiracy, "allows [the plaintiff] to hold the defendants jointly and severally liable for damages caused by actions taken in furtherance of the conspiracy." **Envirotech, Inc. v. Thomas**, 259 S.W.3d 577, 587 (Mo. Ct. App. 2008).  A civil conspiracy is "an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful." **Id.** at 586.  To survive summary judgment

---

[38]   Resource One Second Am. Compl. at 4-5 [Doc. 123]; Halls Sales Compl. at 4-5 [Doc. 1-3].

on a civil conspiracy claim, a plaintiff must sufficiently set forth facts that support the following elements that "(1) two or more persons; (2) with an unlawful objective;[39] (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged." **Rice v. Hodapp**, 919 S.W.2d 240, 245 (Mo. 1996) (en banc) (footnote added).  Although a civil conspiracy may be based on circumstantial evidence, Plaintiffs must prove the conspiracy by clear and convincing evidence.  **Koehler v. Warren Skinner, Inc.**, 804 S.W.2d 780, 782 (Mo. Ct. App. 1990).  Such evidence is evidence "'which instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true.'" **Coleman v. Coleman**, 318 S.W.3d 715, 725-26 (Mo. Ct. App. 2010) (quoting In re Marriage of Looney, 286 S.W.3d 832, 837 (Mo. Ct. App. 2009)).

Importantly, "[t]he term unlawful, as it relates to civil conspiracy is not limited to conduct that is criminally liable, but rather may include individuals associating for the purpose of causing or inducing a breach of contract or business expectancy." **Envirotech, Inc.**, 259 S.W.3d at 586 n.8.  Here, Plaintiffs allege and have set forth sufficient facts to demonstrate that Defendants associated for the purpose of causing or inducing interference with Plaintiffs' business expectancies with their vendors.  Even assuming there is a genuine issue of fact regarding the "unlawful" requirement of the conspiracy theory of liability, however, the Court concludes the "meeting of the minds" requirement of civil conspiracy

---

[39]  A civil conspiracy may also involve an unlawful act, rather than or in addition to an unlawful objective.  See **Envirotech, Inc.**, 259 S.W.3d at 586.

liability has not been satisfied and Defendants are entitled to summary judgment on those allegations.

In relevant part, Defendants urge Plaintiffs have no evidence that Defendants reached a meeting of the minds that "Save-A-Lot would coerce and intimidate vendors into appointing Alliance."[40]  At most, Defendants contend, Plaintiffs have evidence that Save-A-Lot assisted Alliance by contacting vendors.

With respect to the allegation that Alliance agreed to "split the commissions it received from [vendors] with Save-A-Lot in return for Save-A-Lot's coercion, intimidation and pressure on the [vendors] to . . . hire Alliance," Plaintiffs refer to deposition testimony of Pat Ragusa,[41] Save-A-Lot's Vice President of Perishable Product Procurement from November 1997 until sometime in early to mid- 2008 who had assisted both with Save-A-Lot's 2007 selection of Alliance, rather than another broker, and Save-A-Lot's efforts in the fall of 2007 and early 2008 to have vendors move to Alliance.[42]  Specifically, Ragusa testified that if the "business was moved from brokers to Alliance, that would mean revenue for Save-A-Lot" in

---

[40] Defendants also argue that the conspiracy claim fails as a matter of law because Plaintiffs' coercion and Robinson-Patman Act bases for the tortious interference and unfair competition claims, fail as a matter of law.  Because the Court determines there is no genuine issue of material fact regarding the "meeting of the minds" requirement and that Defendants are entitled to judgment as a matter of law on the conspiracy theory of liability, the Court will not address these other arguments.

[41] Alliance also mentions that Plaintiffs refer to deposition testimony of Mark Goodman but the Court does not find such a reference in Plaintiffs' discussion of the conspiracy allegations with respect to Defendants' pending summary judgment motions.

[42] See Ragusa Dep. at 78, 80, 113-19, 121, 122, 142, 143-44, 149, 163-65, 175, 176, 178, 179, 180, 204-05, Exs. attached to Pls. Resp. Defs. Mots. Summ. J., Ex. 20 [Doc. 270-41].

that Alliance agreed to give a large portion of its commissions to Save-A-Lot and Ragusa referred to (i) a timeline established by Defendants to work on the vendors' appointment of Alliance, (ii) appointments held with vendors, and (iii) services provided by Save-A-Lot such as providing regular weekly updates on the status of converting vendors to Alliance, communicating with vendors and meeting with vendors at the PLMA meeting in November 2007 and at the St. Louis meeting in December 2007 to get them to consider Alliance. (Id.) As Defendants point out Ragusa's testimony does not establish he was present for any discussions between Save-A-Lot and Alliance where they reached any agreement for Save-A-Lot to "pressure, coerce, or intimidate" vendors to sign up with Alliance in exchange for payment of commission dollars to Save-A-Lot, or any agreement for Save-A-Lot to engage in the allegedly improper conduct it engaged in to get Plaintiffs' vendors to appoint Alliance. Nor does Ragusa's deposition testimony indicate that he, on behalf of Save-A-Lot, entered into any such agreement. While Ragusa's deposition testimony indicates his familiarity with activities Save-A-Lot engaged in to get vendors to use Alliance as their broker, there is no indication in the cited deposition testimony that Alliance and Save-A-Lot had a meeting of the minds for Save-A-Lot to engage in any allegedly improper activities or for Save-A-Lot to "pressure, coerce, or intimidate" vendors, as Plaintiffs allege.

Moreover, Defendants urge, Plaintiffs have not shown that Alliance knew about and adopted any statements by Save-A-Lot personnel that are relied on by Plaintiffs to show Save-A-Lot pressured, intimidated, or coerced vendors. Without a showing of such knowledge and adoption of the statements as its own, Alliance argues, Plaintiffs cannot

establish a conspiracy, citing **Mika v. Central Bank of Kan. City**, 112 S.W.3d 82, 95 (Mo. Ct. App. 2003) (affirming trial court's grant of summary judgment on the civil conspiracy claim as to certain conspirators because there was no evidence those conspirators knew of misrepresentations by other alleged conspirator). At most, Defendants contend, viewed in a light most favorable to Plaintiffs, the evidence shows Defendants reached a meeting of the minds to enter into a business arrangement in which Alliance would serve as a broker for sales to Save-A-Lot, Alliance would provide Save-A-Lot a portion of the commissions Alliance received, and Save-A-Lot would encourage vendors to consider appointing Alliance as their broker to the extent they were free to do so. The summary judgment record does not support a determination that Defendants' alleged business relationship supports a conspiracy theory.

Plaintiffs rely on **Dickey v. Johnson**, 532 S.W.2d 487 (Mo. Ct. App. 1975), as support for the meeting of the minds element of their civil conspiracy theory of liability. In **Dickey**, the Missouri Court of Appeals found the meeting of the minds element established by a document reflecting two conspirators' ideas for putting economic pressure on another person through the filing of a lawsuit and causing delay. **Id.** at 501, 502. Plaintiffs do not refer to any such document in this case.

Absent such evidence, and because Plaintiffs have not directed the Court to other evidence of Alliance's agreement that Save-A-Lot convince vendors to select Alliance in the manner Save-A-Lot used, there is no genuine issue of material fact regarding the meeting of

the minds element of the conspiracy theory, and Defendants' motions for summary judgment on the civil conspiracy theory of liability will be granted.

Tortious Interference Claims.    To make a submissible case on their tortious interference claims, Plaintiffs must demonstrate "(1) a valid business expectancy [or contract]; (2) defendant's knowledge of the relationship [or contract]; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." **Stehno v. Sprint Spectrum, L.P.**, 186 S.W.3d 247, 250 (Mo. 2006) (en banc). Plaintiffs must "adduce substantial evidence supporting each and every element" of those claims. **Service Vending Co. v. Wal-Mart Stores, Inc.,** 93 S.W.3d 764, 769 (Mo. Ct. App. 2002) (internal quotation marks omitted) (quoting 21 West, Inc. v. Meadowgreen Trails, Inc., 913 S.W.2d 858, 870 (Mo. Ct. App. 1995).  A tortious interference claim fails if a plaintiff does not establish substantial evidence of any one element of the claim. **SSM Health Care, Inc. v. Deen**, 890 S.W.2d 343, 346 (Mo. Ct. App. 1994).  "Substantial evidence is that which, if true, has probative force upon the issues and from which the trier of fact can reasonably decide the case."    **Topper v. Midwest Div., Inc.**, 306 S.W.3d 117, 125 (Mo. Ct. App. 2010). Notably, liability on a tortious interference claim "'cannot be predicated upon speculation, conjecture, or guesswork.'" **Wash Solutions, Inc. v. PDQ Mfg., Inc.**, 395 F.3d 888, 896 (8th Cir. 2005) (applying Missouri law) (quoting Mueller v. Abdnor, 972 F.2d 931, 938 (8th Cir. 1992)).

With respect to these elements, Defendants do not contest the second element but

present arguments that they are entitled to summary judgment because Plaintiffs did not have a valid business expectancy with the relevant vendors; Defendants' conduct did not cause a breach of any business expectancy with respect to one or more of the relevant vendors; Defendants' challenged conduct was justified; and Plaintiffs are not entitled to damages because the alleged losses are speculative and not compensable.[43]

*Valid Business Expectancy.* Defendants argue Plaintiffs cannot establish this first element of Plaintiffs' tortious interference claims because Resource One had no legally cognizable business expectancy in future contracts with Kroger and Kahiki, and Halls Sales had no legally cognizable business expectancy in future contracts with Baumer Foods, Malt-O-Meal, Lance, and Liberty Gold.

An existing contract is not necessary to establish a tortious interference claim.[44] **Cole v. Homier Distrib. Co.**, 599 F.3d 856, 861 (8th Cir. 2010) (applying Missouri law) (citing Stehno, 186 S.W.3d at 251). Instead, such a claim may be based on a business expectancy, characterized as "[a] probable future business relationship that gives rise to a reasonable expectancy of financial benefit." **Stehno**, 186 S.W.3d at 251; accord **Cole**, 599 F.3d at 861 (quoting Stehno, 186 S.W.3d at 251). The business expectancy must be "reasonable and valid under the circumstances alleged." **Wash Solutions, Inc.**, 395 F.3d at 895 (internal

---

[43] The Court will address the damages issues after the discussion of the other aspects of the tortious interference and unfair competition claims.

[44] The undisputed record clearly shows that at least two, and perhaps more, of the six relevant vendors had contracts with Plaintiffs in effect at the time Defendants allegedly interfered with those broker relationships.

quotation marks omitted) (quoting <u>Service Vending Co.</u>, 93 S.W.3d at 769). Disputes regarding whether or not the business expectancy is reasonable, and whether or not Plaintiffs are credible in their assertions as to their expectancies, are questions for the jury. <u>See</u> **<u>Londoff v. Walnut St. Sec., Inc.</u>**, 209 S.W.3d 3, 10 (Mo. Ct. App. 2006).

While more than "mere hope" of continuing a business relationship is required to show the reasonableness of a business expectancy, **<u>Stehno</u>**, 186 S.W.3d at 250, "a regular course of similar prior dealings suggests a valid business expectancy," **<u>Slone v. Purina Mills, Inc.</u>**, 927 S.W.2d 358, 370 (Mo. Ct. App. 1996); <u>accord</u> **<u>Conoco, Inc. v. Inman Oil Co.</u>**, 774 F.2d 895, 907 (8th Cir. 1985) (applying Missouri law) (a twenty-year customer relationship was a protected business expectancy even though every year the customer offered its business to all bidders).

Here, Defendants argue Plaintiffs did not have a reasonable expectancy in continued business relationships with the vendors Plaintiffs lost after September 2007 because, as the undisputed record shows, each of Plaintiffs' brokerage agreements with the relevant vendors provided that a party could terminate the agreement, with prior notice as specified in the agreement, where required, and Plaintiffs do not contend any of the relevant vendors breached an agreement when terminating their brokerage relationship with Plaintiffs.[45]

---

[45] While the affidavit of Resource One's owner, Ed Cuccio, contains an averment that Kroger breached its agreement with Resource One by selling directly to Save-A-Lot between Kroger's December 2007 notice of termination of the brokerage agreement with Resource One and the 2008 termination date of that agreement (<u>see</u> Cuccio Aff. ¶ 19 [Doc. 270-4]), that breach has not been the basis of any argument by Resource One, or Halls Sales, regarding the business expectancy element of either Plaintiff's tortious interference claim. Therefore, the Court understands Plaintiffs do not

"The fact that [the vendors] did not breach the terms of the[ir brokerage agreements with Plaintiffs] because [those agreements permit their termination by one of the parties to the agreement] does not free others not party to the contract[s] from liability if they tortiously interfered with that relationship." **Topper,** 306 S.W.3d at 125 (citing <u>Clinch v. Heartland Health</u>, 187 S.W.3d 10, 15 (Mo. Ct. App. 2006)).  The third party's interference with those agreements "is actionable, because, until one of the contracting parties terminates the contract, the parties are in a subsisting relation that presumably will continue and is of value to the plaintiff." **Id.** (internal quotation marks omitted) (quoting <u>Clinch</u>, 187 S.W.3d at 15).

Here, there is no dispute that, other than Kahiki, the relevant vendors had multi-year broker relationships with Plaintiffs for sales to Save-A-Lot before they terminated those relationships after September 2007.  For instance, Resource One, which came in to existence in 1991, and its predecessor from about 1987 until 1991, had represented Kroger in its sales to Save-A-Lot for approximately 19 years by the fall of 2007.  (<u>See</u>, <u>e.g.</u>, Cuccio Aff. ¶1 [Doc. 270-4].)  Additionally, Halls Sales had represented its vendors for over four years (Liberty Gold) or six years (Baumer Foods, Lance, and Malt-O-Meal) by the time those vendors terminated their broker relationship with Halls Sales.

There is also evidence that those brokerage relationships between Plaintiffs and the the relevant vendors, other than Kahiki, for sales to Save-A-Lot would have continued absent the 2007 change in Save-A-Lot's purchasing program. For example, Larry Hayes, Retail Sales

---

contend Kroger or any other vendor breached a brokerage agreement with Plaintiffs when terminating those brokerage agreements.

Manager at Kroger averred that, after the 2008 termination of the brokerage agreement with Resource One, Kroger entered into a "backroom services agreement" with Resource One regarding Save-A-Lot. (Hayes Aff. ¶ 8 [Doc. 218-10].) Additionally, William Boehm, Senior Vice President of Kroger and President of Kroger Manufacturing in 2007 and until his retirement in the spring of 2008, averred that:

> When we sent the termination letter [to Resource One in December 2007], it was not our desire or intent to end our relationship with Resource One. We were happy with its performance at Save-A-Lot and other accounts.
>
> We had wanted our long standing and positive relationship with Resource One to continue. . . .
>
> *    *    *
>
> It's unlikely we would have terminated Resource One's representation of [our] products at Save-A-Lot had it not been for Save-A-Lot's expressed desire that we appoint Alliance.

(Boehm Aff. ¶¶ 6, 7, 8 [Doc. 270-2].) Brian Berge of Liberty Gold, testified that Liberty Gold enters into a brokerage relationship anticipating that it will continue "for as long as possible." (Berge Dep. at 115 [Doc. 270-24].) Al Baumer of Baumer Foods, reported to Gary Halls in October 2007 that he had told Defendants that Baumer Foods was "satisfied with our current broker and w[as] not interested in making any changes at the present time," and testified that Gary Halls had given Baumer Foods "excellent representation through the years we dealt with him." Baumer Dep. at 16, 34 [Doc. 270-23].) On the other hand, there is evidence that Gary Halls told or agreed with three of his vendors that they should move to Alliance, that Kroger's termination of Resource One in December 2007 was unrelated to any

conduct of Defendants, based on Hayes's averments, and that one or more vendors may have left Plaintiffs due to a difference in services provided by Alliance. <u>See</u> **<u>Kirk v. Harter</u>**, 188 F.3d 1005, 1009 (8th Cir. 1999) (discussing Missouri law) (finding no tortious interference where the customers testified to dissatisfaction with the plaintiff's business).

As to Kahiki, there is evidence that Resource One understood, based on the recent work they had done with Kahiki regarding private label products, that they had the possibility of representing Kahiki in its sales of private label products to Save-A-Lot; but the circumstances of that work establish at most a "mere hope" of continuing a business relationship with Kahiki as broker for its sales of private label products to Save-A-Lot and a "mere hope" is not enough to establish a reasonable business expectancy. <u>See</u> **<u>Stehno</u>**, 186 S.W.3d at 250. Nor is there any indication of record that Kahiki, Resource One, and Save-A-Lot had "a regular course of similar prior dealings" to suggest a valid business expectancy. <u>See</u> **<u>Slone</u>**, 927 S.W.2d at 370.

Under the circumstances, Defendants' summary judgment motions will be granted on the ground of valid business expectancy as to Resource One's tortious interference claim for the loss of Kahiki only, and will be denied on the ground of valid business expectancy as to both Plaintiffs' tortious interference claims for the loss of each of the other five relevant vendors. As to the latter tortious interference claims, it is for the jury to resolve whether or not any business expectancy of Plaintiffs as to each of those five vendors is reasonable and whether or not Plaintiffs are credible on their assertions as to those expectancies. <u>See</u>

**Londoff**, 209 S.W.3d at 10.

*Causation.* Defendants next contend that neither Plaintiff can establish the third or causation element of their tortious interference claims because the undisputed evidence shows Defendants' conduct failed to cause any breach by Kroger of its brokerage agreement with Resource One or any breach by Baumer Foods, Malt-O-Meal, Lance, and Liberty Gold of their brokerage agreements with Halls Sales when those brokerage relationships were terminated or changed after September 2007.

For the causation element of a tortious interference claim, "Missouri courts apply a 'but for' test." **Tamko Roofing Prods., Inc. v. Smith Eng'g Co.**, 450 F.3d 822, 830 (8th Cir. 2006) (applying Missouri law). In deciding whether the "but for" test is satisfied, the Court considers whether the defendant "actively and affirmatively t[ook] steps to induce [a] breach [or loss of the business expectancy]; and, if so, would the plaintiff's business expectancy [have] been realized in the absence of the defendant's interference?" **Ozark Emp't Specialists, Inc. v. Beeman**, 80 S.W.3d 882, 894 (Mo. Ct. App. 2002) (citing Fabricor, Inc. v. E. I. Dupont de Nemours & Co., 24 S.W.3d 82, 93 (Mo. Ct. App. 2000)); accord **Tamko Roofing Prods., Inc.**, 450 F.3d at 830 (applying Missouri law). "'Induce' is defined as 'to move and lead (as by persuasion or influence), to inspire, call forth or bring about by influence or stimulation.'" **Fabricor, Inc.**, 24 S.W.3d at 94 (quoting Merriam Webster's Collegiate Dictionary 594 (10th ed. 1994)). Circumstantial evidence may establish that a defendant's conduct induced a breach or change in the business expectancy. **Id.** "The

pertinent issue is whether or not [the vendors] would have persisted in th[e brokerage] relationship with [Plaintiffs] but for the conduct of [Defendants]." **Topper,** 306 S.W.3d at 125.

"Whether a defendant has played a material and substantial part in causing the plaintiff's loss of the benefits of the contract [or business relationship] is normally a question of fact for the jury." **Howard v. Youngman**, 81 S.W.3d 101, 114 (Mo. Ct. App. 2002) (discussing a tortious interference with a contract claim); <u>accord</u> **Tri-Continental Leasing Co. v. Neidhardt**, 540 S.W.2d 210, 219 (Mo. Ct. App. 1976) ("[T]he question of proximate cause [in a tortious interference case] is ordinarily for jury determination"). If, however, there is no evidence linking the defendant to the enticement of a party in a business relationship to end that relationship, then the jury question is removed from the case. <u>See</u> **Tri-Continental Leasing Co.**, 540 S.W.2d at 219 (affirming a trial court decision setting aside a jury verdict for the plaintiff in a tortious interference with contract case where the only evidence showed a party decided to repudiate the contract with the plaintiff before defendants took any action); <u>accord</u> **Tamko Roofing Products, Inc.**, 450 F.3d at 830 (affirming the grant of summary judgment in favor of a defendant on a tortious interference claim because causation was not established in that the plaintiff only showed that defendant's conduct occurred two years after the breach of contract that was the basis of the claim").

*Causation as to Kroger and Resource One/Save-A-Lot.* As to Kroger, there is an

affidavit of Larry Hayes, the Retail Sales Manager at Kroger, stating that Kroger had automatically renewed year-long agreements with Resource One, entered into on November 2, 2006, and January 25, 2007, for the sale of Kroger's dairy, grocery, and bakery products to various grocery stores, including Save-A-Lot. (Hayes Aff.¶¶ 1, 3, 4, 5, [Doc. 218-10].) Kroger terminated those agreements, with the agreements' required twelve-month notice, by letter dated December 5, 2007, so that Resource One was no longer Kroger's broker for sales to Save-A-Lot as of early December 2008. (Id. ¶ 6.) Kroger then entered into a "backroom services agreement" with Resource One with respect to Save-A-Lot. (Id. ¶ 8.) The "backroom services agreement" contained a ninety-day notice of termination period, rather than the one-year notice of termination period that had been in the earlier agreements between Kroger and Resource One. (Id.)

Hayes avers that Kroger decided to terminate the brokerage agreements with Resource One in 2007 because it wanted to "deal 'in-house' with its milk business and sell directly to some retailers such as Save-A-Lot," and it no longer wanted the one-year notice provision but "wanted to have the ability to terminate its broker agreements on a shorter time period." (Id. ¶ 7.) Hayes further avers that "[n]either Save-A-Lot nor Alliance had any involvement with Kroger's business decision on December 5, 2007 to terminate its relationship with Resource One." (Id. ¶ 9.) Moreover, Hayes avers, "Kroger has never entered into any brokerage agreement with Alliance, and currently continues to sell milk and other products directly to Save-A-Lot." (Id. ¶ 9 [sic, this is the second ¶ 9 in the Hayes affidavit].)

Plaintiffs counter that Resource One's loss of its brokerage relationship with Kroger

for sales to Save-A-Lot resulted from Save-A-Lot's "expressed desire that [Kroger] appoint Alliance" as averred by William Boehm, the Senior Vice President of Kroger and President of Kroger Manufacturing in 2007 until his retirement in the spring of 2008. (Boehm Aff. ¶¶ 1, 8 [Doc. 270-2].)  While agreeing with Hayes that Kroger decided to terminate its then-existing contract with Resource One because Kroger wanted a shorter notice of termination period than was in the existing brokerage agreements and wanted to deal directly with some customers, Boehm further averred that

> [w]hen we sent the termination letter, it was not our desire or intent to end our relationship with Resource One.  We were happy with its performance at Save-A-Lot and other accounts.
>
> We had wanted our long standing and positive relationship with Resource One to continue. . . .
>
> Save-A-Lot had indicated its desire that its [vendors] meet with and appoint Alliance.  Kroger complied with Save-A-Lot's desire for meetings and informed both parties that we were under contract with Resource One.  It's unlikely we would have terminated Resource One's representation of [Kroger] at Save-A-Lot had it not been for Save-A-Lot's expressed desire that we appoint Alliance: but that was a decision that was separate and distinct from the decision to terminate the contract.  We needed to give notice of termination on the contract to get the one-year time frame running while we negotiated a new contract with a shorter termination provision and more flexibility.

(Id. ¶¶ 6-8.)[46]

---

[46]  Save-A-Lot objects to using the statement from Boehm's affidavit that "[i]t's unlikely we would have terminated Resource One's representation of [Kroger] at Save-A-Lot had it not been for Save-A-Lot's expressed desire that we appoint Alliance," because Boehm had retired in the spring of 2008 (see Boehm Aff. ¶ 1 [Doc. 270-2]), and was not involved in the negotiations later in 2008 regarding the relationship between Kroger and Resource One.  The Court limits consideration of the statement to the time during which Boehm was with Kroger, including the time when it terminated its broker relationship with Resource One in late 2007 and the time in early 2008 during which, the record discloses, Kroger told Resource One not to participate in Kroger's sales to Save-A-Lot while

Affidavits, submitted by Plaintiffs, of David Shogren, the Executive Vice President of Resource One in 2007 and 2008, and Ed Cuccio, the founder and president of Resource One, set forth a chronology of communications and meetings they participated in during late 2007 and early 2008 to address, with Kroger, Save-A-Lot's efforts to get Kroger to use Alliance as a broker on sales of Kroger products to Save-A-Lot.[47]  The communications and meetings between Kroger and Defendants during late 2007, show that, after receiving the September 28, 2007, letter from Bill Shaner, Save-A-Lot's CEO, a representative of Alliance, Candy Renda, had a "couple of conversations" with Kroger and Kroger accepted Alliance's invitation to meet, as evidenced by an October 24, 2007 exchange of e-mail communications between Boehm of Kroger and Cuccio of Resource One.[48] On November 12, 2007, during the PLMA meeting, Save-A-Lot scheduled a meeting for four of its executives and two personnel from Alliance to meet with Kroger's representative.  (See Ex. 4 to Bloomquist Dep. [Doc. 270-26 at 12].)  During this meeting to address Kroger's representation by Alliance, Kroger advised that they were going to stay with Resource One.  (Renda Dep. at 146, 148, 150 [Doc. 270-42 at 4-5].)  Kroger then sent its early December 2007 letter giving the required one-year notice to Resource One that it was terminating its agreements with Resource One.

_____

the brokerage agreement between Kroger and Resource One for sales to Save-A-Lot was still in effect. (See Cuccio Aff. ¶ 16 attached to Pls.' Resps. Defs.' Mots. Summ. J.  [Doc. 270-4].)

[47]  Shogren Aff.¶¶ 1, 2, 6, 8, 9, 11, 14 [Doc. 270-47]; Cuccio Aff. ¶¶ 2, 5, 7, 8, 9, 10, 12, 13, 14, 15, 16 [Doc. 270-4].

[48]  Renda Dep. at 143-44 [Doc. 270-42 at 3]; Ex. 1 to Boehm Aff [Doc. 270-3].

Later in December 2007 Kroger and Resource One representatives met to address ways in which Kroger could respond to Save-A-Lot's insistence that Kroger appoint Alliance as its broker for sales to Save-A-Lot.[49] As a result of this meeting and related discussions, Resource One agreed to a "reduced commission rate" and Kroger paid Save-A-Lot a percentage of the net sales it made to Save-A-Lot through 2008 based on a guaranteed minimum amount of such sales for that period.[50] Also, at the end of January 2008, Kroger advised Resource One that Kroger would make direct sales calls on Save-A-Lot, without the presence or attendance of Resource One personnel. (Cuccio Aff. ¶ 16 [Doc. 270-4].)

Due to the timing of Defendants' efforts focused on Kroger's sales to Save-A-Lot in late 2007, the December 2007 notice by Kroger to Resource One of the termination of their broker agreements, and the change in the relationship among Resource One, Kroger, and Save-A-Lot in 2008, there are genuine issues of material fact as to whether or not Save-A-Lot's conduct caused Kroger to end its long-term brokerage relationship with Resource One for sales of Kroger products to Save-A-Lot. Due to the existence of genuine issues of material fact about whether or not Save-A-Lot played a material and substantial part in causing Resource One's loss of its brokerage relationship with Kroger for sales to Save-A-Lot, Save-A-Lot's motion for summary judgment against Resource One is denied to the extent it focuses on the causation element of the tortious interference claim.

---

[49] Shogren Dep. at 127, 128 [Doc. 270-44]; Shogren Aff. ¶¶ 6, 7 [Doc. 270-47].

[50] Shogren Dep. at 129, 132 [Doc. 270-44]; Shogren Aff. ¶¶ 7, 9 [Doc. 270-47]; Ex. 35 to McDaniel Dep. [Doc. 270-40 at 47].

This denial of summary judgment is supported by the Missouri Court of Appeals decision in **Rusk Farms, Inc. v. Ralston Purina Co.**, 689 S.W.2d 671, 679 (Mo. Ct. App. 1985). In that case, the Missouri Court of Appeals found that the defendant's mailing to various commercial entities of a letter asking those entities not to purchase turkeys from the plaintiff, along with the subsequent inability of the plaintiff to sell turkeys to those entities, was sufficient to establish causation for a tortious interference with a valid business expectancy claim as to those entities having a more than one-time prior business relationship with the plaintiff, particularly as to those entities that had not refused to buy from the plaintiff before. **Id.** at 679-81. The plaintiff in **Rusk** had been selling to the relevant commercial entities for five to six years before the defendant sent the letter. **Id.** As in **Rusk**, Resource One had a long-term, almost twenty-year, relationship with Kroger and that relationship ended after Save-A-Lot communicated with Kroger, by letter, telephone calls and/or meetings, its desire that its purchases occur through Alliance. At this point, there is no evidence that Kroger had refused to sell to Save-A-Lot through Resource One prior to the fall of 2007 when Save-A-Lot began communicating its changed business arrangement with Alliance.

*Causation as to Liberty Gold, Baumer Foods, Malt-O-Meal, Lance, and Halls Sales/Save-A-Lot.* For the four vendors that terminated their brokerage relationship with Halls Sales in late 2007 and early 2008, Plaintiffs refer to the following evidence as supporting "a conclusion by a reasonable juror that the those relationships would have

continued absent Save-A-Lot's interference:" Brian Berge of Liberty Gold testified that it terminated Halls Sales as a result of a conversation Berge and Gary Halls had in October or November 2007 with a Save-A-Lot buyer who stated "he would unable to make a decision on [Liberty Gold's] mushroom business going forward until we were able to make a decision to go with Alliance[,] so we felt as though that was pretty much an indication unless we went with Alliance our business [with Save-A-Lot] would go to another manufacturer." (Berge Dep. at 39 [Doc. 270-24].) Berge further stated that Liberty Gold then decided "that the only way we were going to be able to continue to do business with Save-A-Lot was that we would have to make the switch to Alliance at that point in time." (Id. at 40.) Alvin Baumer, Jr. of Baumer Foods testified they were completely satisfied with Halls Sales, but had to terminate their brokerage relationship. (Baumer Dep. at 15-16 [Doc. 270-23].) Mike Arrington of Malt-O-Meal, who was satisfied with Halls Sales, testified that Save-A-Lot "gave a strong endorsement to Alliance" and was "really heating up the pressure" to appoint Alliance. (Arrington Dep. at 39, 54-55 [Doc. 270-22].) Tyler Cook of Lance testified that "[i]f Save-A-Lot did business as it did in the past, then we would still be employing Gary Halls." (Cook Dep. at 70 [270-29].)

Defendants did not dispute this evidence or provide contrary evidence regarding Save-A-Lot's efforts to get these four vendors to appoint Alliance, rather than Halls Sales, as their broker on sales to Save-A-Lot. The only argument regarding the causation element as to these four vendors that Defendants present is the argument that the relevant vendors fulfilled the terms of their brokerage agreements with Plaintiffs; Plaintiffs have never claimed any

breach by the relevant vendors; and the relevant vendors "merely ended their brokerage relationship consistent with the terms and conditions of" the brokerage agreements. Whether or not the relevant vendors breached their brokerage agreements with Halls Sales is not, however, determinative of whether or not Save-A-Lot's communications with and conduct toward those vendors beginning in late 2007 caused the termination of the brokerage relationships Halls Sales had with them. Defendants' argument based on the failure of the relevant vendors to breach their then-existing brokerage agreements with Halls Sales does not create a genuine issue of material fact as to the causation element of Halls Sales tortious interference claim against Save-A-Lot.

Under the circumstances, Save-A-Lot's motion for summary judgment will be denied to the extent it is focused on the causation element of Halls Sales' tortious interference claim. See **Rusk**, supra.

*Causation as to Kroger and Resource One/Alliance*. With respect to Defendants' summary judgment motions focused on Alliance's liability for Kroger's 2007 decision to change its brokerage relationship with Resource One, Plaintiffs respond only that Alliance conspired with Save-A-Lot to interfere with Resource One's broker relationship with Kroger. (Pls.' Resp. Mots. Summ. J. at 89 [Doc. 270].) Specifically, Plaintiffs argue "[b]ut for Save-A-Lot's conspiracy with Alliance to interfere, Resource One would still be continuing on in its representation of [Kroger] at Save-A-Lot like it is at all other . . . accounts." (Id.) Plaintiffs do not otherwise refer to any allegedly improper conduct by Alliance in addressing the cause of Kroger's change in its broker relationship with Resource One. Because the Court

determined earlier in this ruling that Defendants are entitled to entry of summary judgment in their favor on the civil conspiracy theory of liability, conspiracy may not be the sole basis of a Defendant's liability for either of Plaintiffs' claims. Accordingly, for Kroger, Alliance is entitled to entry of summary judgment in its favor on Resource One's tortious interference claim against Alliance, because the sole basis of the third element of that claim is an unsuccessful civil conspiracy theory.

*Causation as to Liberty Gold, Baumer Foods, Malt-O-Meal, Lance, and Halls Sales/Alliance.* Defendants' summary judgment materials do not present argument regarding the causation element of Halls Sales' tortious interference claim against Alliance. Therefore, the Court does not address that issue.

Except as noted with respect to Resource One's tortious interference claim against Alliance, on which summary judgment is granted in favor of Alliance on the ground of causation, Defendants' motions for summary judgment are denied to the extent they focus on the causation element of Plaintiffs' tortious interference claims.

*Absence of Justification.* Defendants argue Plaintiffs cannot establish this fourth element of their tortious interference claims because Defendants were entitled to compete with Plaintiffs and did not act wrongfully.

To establish their tortious interference claims Plaintiffs must affirmatively show a lack of justification. **Stehno**, 186 S.W.3d at 252. "Absence of justification is the absence of any legal right on the part of the defendant to take the actions about which a plaintiff complains." **SSM Health Care, Inc.**, 890 S.W.2d at 346. "Justification for interfering with another's

business expectancy exists when one undertakes to protect a valid economic interest . . . [,] when someone engages in competitive conduct . . .[, or] to avoid a substantial loss." **Environmental Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.**, 178 S.W.3d 691, 703 (Mo. Ct. App. 2005). "If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." **Stehno**, 186 S.W.3d at 252.

"A justification for interference with business relations recognized by Missouri courts is competition between business rivals, as long as that competition meets the standards for appropriate conduct established in § 768 of the Restatement (Second) of Torts." **Machine Maint. & Equip. Co. v. Cooper Indus., Inc.**, 661 F. Supp. 1112, 1115 (Mo. E.D. 1987) (discussing Missouri law); see **Briner Elec. Co. v. Sachs Elec. Co.**, 680 S.W.2d 737, 741-43 (Mo. Ct. App. 1984). "In essence [that section] states that competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations." **Briner Elec. Co.**, 680 S.W.2d at 741. Here, there is no dispute that Alliance is a business rival or competitor of Plaintiffs as a broker working for vendors on sales to Save-A-Lot. Nor is there any dispute that Alliance's challenged conduct was an effort to acquire Plaintiffs' vendors as Alliance's vendors on sales to Save-A-Lot. Therefore, so long as Alliance's competitive conduct was not illegal or independently actionable, or, in other words, so long as Alliance's conduct did not constitute

"improper means" to acquire business from Plaintiffs, then its conduct is justified competitive conduct.

Save-A-Lot is not a business rival of Plaintiffs. Rather, it is the entity buying from the vendors that Plaintiffs, and then Alliance, represented. Therefore, the competitive justification cannot apply to Save-A-Lot. Save-A-Lot urges it has an economic interest that it is justified in protecting through the conduct it allegedly engaged in. Plaintiffs contend Save-A-Lot cannot rely on this basis for justification of its conduct because it is not an owner or shareholder of the vendors and it did not have a contract with the vendors that it was trying to enforce.

"One who has a present existing economic interest, such as a prior contract of his own or a financial interest in the affairs of the person persuaded not to enter into a contract, is privileged to interfere with another's business expectancy to protect one's own economic interest." **Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n**, 796 S.W.2d 369, 372 (Mo. 1990) (en banc). <u>See</u> <u>also</u> Restatement (Second) of Torts § 769 (1979) ("One who, having a financial interest in the business of a third person[,] intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation"). Missouri has considered § 769 of the Restatement (Second) of Torts as an accurate statement of the "applicable rule" for the "absence of justification" element of a tortious interference claim for one who has a financial interest in a contract. **Friedman v. Edward L. Bakewell, Inc.**, 654 S.W.2d 367, 370 (Mo.

Ct. App. 1983).  Comment c to that section states in relevant part that "[t]he financial interest in another's business requisite for the rule stated in this Section is an interest in the nature of an investment."  Restatement (Second) of Torts, § 769, cmt c.

While there is no indication that Save-A-Lot was invested in or had its own contract with any of the relevant vendors so as to fall clearly within this justification, the Missouri Supreme Court has acknowledged that a defendant in a tortious interference case may have "an economic interest in controlling who works on its projects," which constitutes a valid economic justification.  **Stehno**, 186 S.W.3d at 252.  For purposes of Save-A-Lot's pending summary judgment motions, the Court will consider this type of economic interest applicable to the circumstances of this case and, for purposes of the motion, will consider Save-A-Lot as having an economic interest in controlling the entities, i.e., the vendors' brokers if vendors engage in sales to Save-A-Lot through a broker, with which it does business in its late 2007 project to alter the manner in which it conducts its private label business.  Therefore, under the circumstances, Save-A-Lot has a valid economic justification for purposes of Plaintiffs' tortious interference claims against Save-A-Lot.  See **Private Label Brokers Grp. v. Wakefern Food Corp.**, No. UNN C 34-95 at 18, 35-36 (N.J. Super. Ct. Ch. Div. Oct. 21, 1996) (unpublished transcript of oral decision after non-jury trial) ("**Wakefern**") (finding a grocer "has the absolute right to choose the party it prefers to do business with as long as it acts with legitimate business reasons"), aff'd, No. A-1972-96T5 (N.J. Super. Ct. App. Div.

Apr. 29, 1998) (unpublished per curiam opinion).[51]

Based on the determination that Alliance may engage in competitive conduct and Save-A-Lot may protect its valid economic interest in controlling who works on its projects, Defendants have justifications for interfering with Plaintiffs' brokerage relationships with the relevant vendors. Therefore, to establish the fourth element of their tortious interference claims, Plaintiffs must establish that Defendants used "improper means" in engaging in their challenged conduct. **Stehno**, 186 S.W.3d at 252.

The fact that the defendant is motivated by self-interest and that the conduct may have a negative effect on a plaintiff's business expectancies are not enough to establish an absence of justification. See **SSM Health Care, Inc.**, 890 S.W.2d at 346 (addressing self-interest motivation); **Community Title Co.**, 796 S.W.2d at 373 (addressing negative effect). Rather, as noted before, "[i]mproper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." **Stehno**, 186 S.W.3d at 252. While a plaintiff pursuing a tortious interference claim does not need to establish every element of the claim supporting the allegedly wrongful act, see, e.g., **Wenthe v. Willis**

---

[51] These decisions are available at Ex. A attached to Defendant Save-A-Lot's reply in support of its motion for summary judgment against Plaintiff Halls Sales [Doc. 289-1].

The parties also refer to **Calk v. Albertson's, Inc.**, Civil Action No. SA-93-CA-405 (W.D. Tex. Sept. 27, 1995), as relevant to the issues before this Court. That citation is to a United States Magistrate Judge's Report and Recommendation, and there is no indication of record that the Report and Recommendation was adopted by a United States District Court. Therefore, this Court will not further address that citation.

**Corroon Corp.**, 932 S.W.2d 791, 794-96 (Mo. Ct. App. 1996), there needs to be sufficient compliance with the requirements of the underlying claim to support a determination that the claim constitutes an "independently wrongful" act recognized by common or statutory law, see **Nazeri v. Missouri Valley Coll.**, 860 S.W.2d 303 (Mo. 1993) (the improper means alleged must be "independently wrongful" as recognized by statute or common law). Here, Plaintiffs allege the following improper means: coercion and intimidation, fraudulent concealment, breach of fiduciary duty, violation of the Robinson Patman Act, fraudulent misrepresentations, violation of the Missouri Merchandising Practices Act, violation of the 1968 Federal Trade Commission ("FTC") consent order regarding Alliance, and violation of public policy.[52]

*Coercion and Intimidation.* In summary, Plaintiffs allege that the September 2007 letter and subsequent efforts by Defendants in 2007 and early 2008 through e-mail correspondence, meetings, and conversations directly with Plaintiffs' vendors, as well as the creation and maintenance of the vendor tracking system which assisted Defendants in targeting vendors for replacement, constituted improper pressure on the vendors to terminate their broker relationship with Plaintiffs and appoint Alliance or, whether implicitly or explicitly conveyed, the vendors would lose their business with Save-A-Lot. (Pl. Resource

---

[52] Because these grounds are also the grounds for the unfair competition claims, the Court will address these grounds as to both Defendants and all relevant vendors even though the Court is granting summary judgment in favor of Defendants on Resource One's tortious interference claim for Kahiki (due to the absence of a valid business expectancy) and in favor of Alliance on Resource One's tortious interference claim for Kroger (due to a lack of causation).

One Second Am. Compl. ¶¶ 17-34 [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 17-26 [Doc. 1-3].)

More specifically, Plaintiff Resource One alleges that in the Fall of 2007 David McDaniel, a Save-A-Lot executive, told Kroger representatives, after they said they had a one-year broker services contract with Resource One, "[t]hat's your problem; you need to move the business" to Alliance. (Pl. Resource One Second Am. Compl. ¶¶ 25 [Doc. 123]; see also id. ¶¶ 27, 29, 30.) In February 2008, Resource One alleges, a Save-A-Lot representative, David Bloomquist, told Resource One a few of its vendors were losing or targeted to lose business with Save-A-Lot because they refused to appoint Alliance as their broker. (Id. ¶ 24.) Resource One further alleges that, as a result of this "pressure, coercion, intimidation and inducement," Kroger agreed to pay Save-A-Lot an amount "to avoid being replaced for not immediately terminating Resource One" and gave Resource One notice that it was terminating its broker services agreement effective December 4, 2008. (Id. ¶ 28 (emphasis in original).) Kroger also allegedly reduced the commissions it paid Resource One in 2008 commensurate with the amount Kroger paid Save-A-Lot. (Id.) Plaintiff Halls Sales more specifically alleges McDaniel told representatives of some of Halls Sales's vendors, in particular, Baumer Foods and Lance; a Save-A-Lot buyer, Tom Maguire, told another of Halls Sales's vendors, Liberty Gold; and an unidentified Save-A-Lot representative told another of Halls Sales's vendors, Malt-O-Meal, that those vendors would either lose Save-A-Lot's business if Alliance was not appointed as their broker or would gain more business from Save-A-Lot if they terminated Halls Sales and hired Alliance as their vendor. (Pl. Halls Sales Compl. ¶¶ 20-21 [Doc. 1-3].)

Both Plaintiffs then allege that Save-A-Lot engaged in other interference,[53] including (a) contacting all private label vendors having brokers other than Alliance in November and December 2007 and insisting they send a representative to meet with Save-A-Lot's top executives in St. Louis without their brokers present; (b) creating scripts for its buying personnel to use to pressure vendors into appointing Alliance and terminating Plaintiffs; (c) telling vendors they were required to send a representative "into every Save-A-Lot store twice a month to perform certain services which had never been required before" and then telling them that Alliance would do it for them at no additional cost if Alliance was their broker; (d) following up with the vendors by asking when their personnel would be in the Save-A-Lot stores to comply with that new requirement, when there was no such requirement; (e) assigning personnel to each vendor to get them to use Alliance; and (f) terminating an executive, Pat Ragusa, in February 2008 "for inadequate effort or results in compelling certain [vendors] to sign up with Alliance" and making other employees aware of that termination. (Id. ¶ 24; Pl. Resource One Second Am. Compl. ¶ 31 [Doc. 123].)

Alliance argues it is entitled to summary judgment on this aspect of Plaintiffs' tortious interference claims because the six relevant vendors have stated that "Alliance did not coerce, threaten, or intimidate them in any way" before they decided to terminate or change their broker relationships with Plaintiffs. Plaintiffs counter that whether or not Alliance exerted

---

[53] Resource One also identifies other instances of allegedly coercive or intimidating conduct, but those instances do not clearly pertain to vendors that left Resource One. (Pl. Resource One Second Am. Compl. ¶¶ 31(7)-31(12) [Doc. 123].)

any pressure is immaterial "as Alliance is responsible for Save-A-Lot's actions in furtherance of the conspiracy." (Pls.' Resp. Defs.' Mots. Summ. J. at 92 n. 60 [Doc. 270].) Because the Court has determined that summary judgment in favor of Defendants should be granted with respect to the conspiracy theory of liability, the Court will only consider whether the record supports this basis for Plaintiffs' tortious interference claims against Alliance due to Alliance's actual participation in such conduct. Having reviewed the record, the Court finds Alliance is entitled to summary judgment on the coercion-intimidation basis for Plaintiffs' tortious interference claims because Plaintiffs have not demonstrated a genuine issue of material fact regarding that basis for those claims as against Alliance, and the undisputed record establishes that Alliance did not coerce, intimidate, threaten, or pressure any of the six vendors prior to their change in or termination of their broker relationships with Plaintiffs.[54]

---

[54] See Def. Alliance Statem. Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Halls Sales ¶¶ 63, 64, 68, 74, 78 [Doc. 205]; Baumer Dep. at 88 [Doc. 205-4]; Cook Dep. at 107 [Doc. 205-6]; Berge Dep. at 137 and 138 [Doc. 205-3]; Arrington Dep. at 165 [Doc. 205-9]; Def. Alliance Statem Uncontr. Mat. Facts Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 67, 68, 73, 74, 76, 77 [Doc. 201]; Hayes Aff. ¶ 9 [Doc. 201-25]; Hoover Dep. at 64-65 [Doc. 201-2], Klein Dep. at 53-54 [Doc. 201-27].

Plaintiff Resource One refers this Court to the affidavit of William Boehm, Senior Vice President of Kroger and President of Kroger Manufacturing during 2007 and until his retirement in the spring of 2008, [Doc. 270-2], to demonstrate the existence of a genuine issue of material fact regarding whether or not Alliance threatened, coerced, pressured, or intimidated Kroger to change its broker relationship with Resource One for sales to Save-A-Lot. (See Pl. Resource One's Resp. to Def. Alliance Statem. Uncontr. Mat. Facts in Supp. Mot. Summ. J. against Pl. Resource One ¶¶ 73 and 74 [Doc. 275].) The Boehm Affidavit, however, does not mention or make any reference to the presence or absence of any threats, coercion, pressure, or intimidation by either Defendant. Therefore, the Court understands there is no genuine issue of material fact, due to the absence of evidentiary material opposing the Hayes affidavit, regarding Alliance's participation in any threats, coercion, pressure or intimidation of Kroger before it decided in late 2007 to alter its broker relationship with Plaintiff Resource One.

Save-A-Lot urges that Plaintiffs' allegations of coercion and intimidation do not support a civil action for coercion or intimidation because coercion usually arises in the criminal context, citing **State v. Mandrell**, 754 S.W.2d 917, 919 (Mo. Ct. App. 1988) (defining coercion by quoting Mo. Rev. Stat. § 570.010.(3)), and defining "intimidation" is defined as "[u]nlawful coercion; extortion" in Black's Law Dictionary 827 (7th ed. 1999)). Save-A-Lot further contends that another court has found a buyer's contact by letter with a brokers' vendors was not coercive where the letter invited but did not require the vendors to select the broker suggested by the buyer. **Wakefern**, No. UNN C 34-95 at 14-15. Because the **Wakefern** case does not clearly involve circumstances identical to this case, the Court will not grant summary judgment on the basis of any similarity between the letter sent to vendors in **Wakefern** and the September 28, 2007, letter sent here.

Save-A-Lot also argues the undisputed record shows that neither Kroger nor Halls Sales' four vendors were "induce[d], coerce[d], intimidate[d], and pressure[d]" to switch to Alliance; that Kroger's decision was a "business decision that had nothing to do with" Defendants; that neither Defendant threatened to stop or reduce Save-A-Lot's business with Kroger if it did not appoint Alliance as its broker on sales to Save-A-Lot; that Kroger did not

---

To support its position that there is a genuine issue of material fact regarding Alliance's coercion and intimidation, Plaintiff Resource One refers this Court to paragraph 25 of Shogren's affidavit [Doc. 270- 47] and Resource One's answer to Save-A-Lot's first interrogatory no. 10 [Doc. 270-79] in response to Defendant Alliance's reference to Klein. Paragraph 25 of Shogren's affidavit, however, addresses vendors other than the six at issue here; and Resource One's answer to interrogatory no. 10 does not address Alliance's participation in any threatening, coercive, pressuring, or intimidating conduct against the six relevant vendors before they decided to change or terminate their broker relationships with Plaintiffs.

appoint Alliance, after it terminated Resource One, as its broker on sales to Save-A-Lot; that

Halls Sales's vendors did not report any threats to state or federal authorities or file a lawsuit

based on such allegations; and Gary Halls, owner of Halls Sales, acknowledged that "none

of the vendors for which he is claiming damages ever told him that they were threatened or

coerced to hire Alliance."

Plaintiffs counter that the propriety of interference with an existing contract is

determined by considering the factors set forth in Restatement (Second) Torts § 767 as

adopted in **Howard**, 81 S.W.3d at 116; and the comments on clause (a) of that section

address the propriety of economic pressure, which when applied to the circumstances of this

case show Defendants' pressure and coercion was not proper.

Section 767 of the Restatement (Second) Torts states:

In determining whether an actor's conduct in intentionally interfering with a
contract or a prospective contractual relation of another is improper or not,
consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the
contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979). The Comment on Clause (a) of that section

discussing "Economic Pressure" states:

Economic pressure of various types is a common means of inducing persons
not to deal with another, as when A refuses to deal with B if B enters into or

> continues a relation with C . . . .  The question whether this pressure is proper
> is answered in the light of the circumstances in which it is exerted, the object
> sought to be accomplished by the actor, the degree of coercion involved, the
> extent of the harm that it threatens, the effect upon the neutral parties drawn
> into the situation, the effects upon competition, and the general reasonableness
> and appropriateness of this pressure as a means of accomplishing the actor's
> objective.

Restatement (Second) of Torts § 767 cmt. on Clause (a) (1979) (emphasis added).  But see

Restatement (Second) of Torts § 768 (1979), which addresses competition as a proper or

improper interference.

In support of this argument, Plaintiffs refer to numerous communications between

Save-A-Lot and Kroger representatives, and among Save-A-Lot representatives, as well as

certain testimony of Ragusa, to show the circumstances under which economic pressure, i.e.,

the potential loss of Save-A-Lot business for not appointing Alliance and the benefit of

appointing Alliance, was exerted on Kroger by Save-A-Lot to get Kroger to terminate

Resource One in late 2007 and early 2008.[55]  Save-A-Lot counters that the affidavit of Larry

Hayes [Doc. 218-10], Kroger's Retail Sales Manager, contradicts Plaintiffs' evidentiary

material.  Having reviewed the record, the Court concludes genuine issues of material fact

exist regarding whether Kroger changed its broker relationship with Resource One as a result

of improper economic pressure exerted by Save-A-Lot.

Additionally, for Halls Sales' vendors, there are genuine issues of material fact

---

[55]  See, e.g., evidentiary references at pages 51-54, 57, 63, 68, 70-89 of Pls. Resp.
Mots. Summ. J. [Doc. 270].

regarding whether Liberty Gold was improperly pressured by Save-A-Lot.[56] Save-A-Lot has not presented evidence that its representatives did not threaten, pressure, or intimidate Halls Sales's vendors.[57] Save-A-Lot's motion for summary judgment regarding coercion and intimidation as a basis for the tortious interference claims is denied.

*Breach of Fiduciary Duty, Fraudulent Concealment, and Fraudulent Misrepresentation Bases for the Tortious Interference Claims.* For the breach and fraudulent concealment bases for Plaintiffs' tortious interference claims, Plaintiffs allege that Alliance has a fiduciary duty as an agent seeking appointment by vendors to disclose to those vendors "the financial interests it has which would naturally influence its conduct in ways detrimental to" the vendors; and that Alliance has such undisclosed financial interests and conflicts of interest in that it "represent[s] competing vendors at the same time on competing products," it is "in fact a buyer's broker loyal to Save-A-Lot," and "it has financial arrangements with Save-A-Lot that influence its conduct and loyalties." (Pl. Resource One Second Am. Compl. ¶¶ 37, 38 [Doc. 123], Pl. Halls Sales Compl. ¶¶ 29, 30 [Doc. 1-3]).[58]

---

[56] See, e.g., deposition of Brian Berge at 79-80 [Doc. 224-3] (someone at Save-A-Lot told him "on the telephone that [Liberty Gold] would not be able t[o] continue as a [vendor] until [Liberty Gold] made the decision to hire Alliance . . . impl[ying] that in order to continue doing business with Save-A-Lot, [Liberty Gold] had to hire Alliance"); see also Berge Dep. at 39 [Doc. 270-24].

[57] Save-A-Lot cites to deposition testimony, see, e.g., Def. Save-A-Lot's Mem. Supp. Mot. Summ. J. against Pl. Halls Sales at 30 nn. 55 and 57, but those citations are to deposition testimony that Alliance did not threaten, coerce, intimidate, or pressure those vendors, rather than to deposition testimony that Save-A-Lot did not threaten, coerce, intimidate, or pressure those vendors.

[58] Plaintiffs also allege an "intentional inducement of breach of fiduciary duty" basis for their tortious interference claims with allegations that Save-A-Lot knew or should have known that the effect of the arrangement to obtain commissions would induce Alliance, "a buyer's broker, to breach

- 51 -

For the fraudulent misrepresentation basis of their tortious interference claims, Plaintiffs allege Defendants have made the following false statements to Plaintiffs' vendors to induce them to terminate Plaintiffs and hire Alliance:

(a) vendors were told that Alliance was selected as Save-A-Lot's "primary strategic resource" and "merchandising and marketing partner" in a new effort to make Save-A-Lot's private brands more "consumer-centric" and "regionally relevant," when in actuality Alliance was chosen by Save-A-Lot and Save-A-Lot wanted vendors to appoint Alliance as their broker because Alliance agreed to turn a large percentage of the commissions paid to it by its vendors over to Save-A-Lot (Pl. Resource One Second Am. Compl. ¶¶ 47(a)-47(c), 47(j)-47(m), 47(o)-47(p) [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 39(a)-39(c), 39(j)-39(m), 39(p) [Doc. 1-3]);[59]

_____

its fiduciary duties to suppliers that appointed it, and Save-A-Lot's agreement with Alliance . . . is inducing and has induced such breaches" (emphasis added). (Pl. Resource One Second Am. Compl. ¶ 41 [Doc. 123]; Pl. Halls Sales Compl. ¶ 33 [Doc. 1-3].)  While it is not clear that this is properly a basis for Plaintiffs' tortious interference claims, because it focuses on circumstances after Alliance is a vendor's broker, rather than circumstances while a vendor uses one of the Plaintiffs as a broker, none of the pending summary judgment motions clearly addresses this basis of the tortious interference claims.  Therefore, the Court will not further discuss these allegations.

[59]  Resource One also includes allegations not included by Halls Sales regarding (a) Save-A-Lot's consideration of another broker and Alliance before choosing Alliance allegedly because it would give Save-A-Lot more commissions than the other broker, because it "was already a broker and licensee of Save-A-Lot," because it was "under Save-A-Lot's control," and because it provided Save-A-Lot with control over the use of the commissions paid by Alliance (Resource One Second Am. Compl. ¶ 47(j) [Doc. 123]); and (b) Save-A-Lot's statement in its September 2007 letter that Defendants' relationship would benefit vendors by increasing sales of Save-A-Lot's private brand products when Save-A-Lot executives allegedly wanted the commissions paid to Save-A-Lot by Alliance either to meet Super Value's "profit contribution requirements" or to reduce the price of goods sold to Save-A-Lot's licensees "so they could be more competitive" (id. ¶ 47(n)).

(b) Alliance told vendors "it was 100% dedicated to growing your business with Save-A-Lot" when Alliance was actually "dedicated to Save-A-Lot's business" and represented "competing vendors at the same time . . . so that one of its [vendor]'s sales to Save-A-Lot will often suffer at the expense of its competing [vendor]'s sales to Save-A-Lot" (Pl. Resource One Second Am. Compl. ¶ 47(f) [Doc. 123]; Pl. Halls Sales Compl. ¶ 39(f) [Doc. 1-3]);

(c) to "create a reason why vendors should hire Alliance and terminate existing brokers" Defendants told vendors that this change in Defendants' business arrangement was for the vendors' "benefit of increased sales and profits," when the new arrangement was to benefit Defendants by increasing their revenues as they had calculated before entering into this arrangement, and vendors were told that Save-A-Lot now required every vendor to have a representative call on every Save-A-Lot store twice a month and Alliance would perform this task to save vendors that expense, when Save-A-Lot "had no such requirement and did not allow such calls" on its stores (Pl. Resource One Second Am. Compl. ¶¶ 47(d)-47(e) [Doc. 123]; see also id. ¶ 47(q); Pl. Halls Sales Compl. ¶¶ 39(d)-39(e) [Doc. 1-3]; see also id. ¶ 39(p));

(d) Defendants represented to vendors that the commissions they paid Alliance "would be used to hire a sales force to call on Save-A-Lot stores to promote the vendors' new products and help their sales at store level" (merchandising personnel) when Defendants had agreed that Alliance would pay a large amount of the commissions it received to Save-A-Lot with the appearance the payments were reimbursement for Save-A-Lot's advertising of the vendors' products or some amount was used "to pay phantom Save-A-Lot employees who

would be on Alliance's payroll but perform services for Save-A-Lot under Save-A-Lot's direction" when, "[i]n fact, all of the dollars turned over to Save-A-Lot were available to be used by Save-A-Lot as it saw fit" and the real service Save-A-Lot rendered to Alliance in return for the commissions was to pressure, coerce, and intimidate the vendors into appointing Alliance and discharging their brokers (Pl. Resource One Second Am. Compl. ¶¶ 47(g)-47(h) [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 39(g)-39(h) [Doc. 1-3]);

(e) all statements made by Defendants to vendors "that implied a different purpose existed for the vendors to appoint Alliance than that [Defendants] desired to capture and divide the commissions which vendors were paying to their loyal [brokers] in the fall of 2007 and to date" (Pl. Resource One Second Am. Compl. ¶ 47(i) [Doc. 123]; Pl. Halls Sales Compl. ¶ 39(i) [Doc. 1-3]);

(f) the statement to vendors regarding Alliance's experience, because in 2007 it had no experience performing the services Save-A-Lot represented it would perform and Alliance's personnel seek vendors for Save-A-Lot, performing the functions of a buying organization for Save-A-Lot (Pl. Resource One Second Am. Compl. ¶ 47(o) [Doc. 123]; Pl. Halls Sales Compl. ¶ 39(n) [Doc. 1-3]);[60] and

(g) statements that some vendors were told they'd get business if they appointed

_____

[60] Plaintiffs also allege as false misrepresentations statements in Alliance's contracts with vendors that Alliance was the agent of the vendors appointing it as broker, "impl[ying] or stat[ing] it was loyal to the vendor[s]." (Pl. Resource One Second Am. Compl. ¶ 47(4) [Doc. 123]; Pl. Halls Sales Compl. ¶ 39(q) [Doc. 1-3]). It is not clear how a contractual provision between Alliance and its vendors supports Plaintiffs' claims for tortious interference and unfair competition.

Alliance, and some vendors were told by Save-A-Lot that the vendors' competitors had appointed Alliance (Pl. Resource One Second Am. Compl. ¶ 47(4) [Doc. 123]; Pl. Halls Sales Compl. ¶ 39(q) [Doc. 1-3]).

Plaintiffs allege these misrepresentations were made in the September 28, 2007, letter from Save-A-Lot to vendors and by Defendants in follow-up conversations and meetings, including at the November 2007 PLMA convention and the December 17, 2007 meeting in St. Louis; and the vendors receiving these misrepresentations relied on the misrepresentations when terminating their brokers and hiring Alliance. (Pl. Resource One Second Am. Compl. ¶¶ 48-52 [Doc. 123]; Pl. Halls Sales Compl. ¶ 40-44 [Doc. 1-3]).

Missouri case law supports the consideration of misrepresentations as a basis for a tortious interference claim. See, e.g., **Clinch**, 187 S.W.3d at 17-18. The following nine elements are required to establish a fraudulent misrepresentation claim,

> (a) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

**Hess v. Chase Manhattan Bank, USA, N.A.**, 220 S.W.3d 758, 765 (Mo. 2007) (en banc). Under certain circumstances, "silence or non-disclosure of a material fact, when used as an inducement to another, can be an act of fraud." **Andes v. Albano**, 853 S.W.2d 936, 943 (Mo. 1993) (en banc). Therefore, while Missouri courts do not recognize a separate tort of fraudulent nondisclosure, "silence in the face of a legal duty to speak [may] replace[] the first

element [of fraudulent misrepresentation]: the existence of a representation." **Hess**, 220 S.W.3d at 765. "This duty [to speak] arises either where there is a relation of trust and confidence between the parties or where one party has superior knowledge or information not within the fair and reasonable reach of the other party." **Andes**, 853 S.W.2d at 943.

Here, Plaintiffs' fraudulent concealment allegations focus not on Defendants' superior knowledge or information but on a fiduciary duty allegedly owed by Alliance to Plaintiffs' vendors in Defendants' efforts to acquire Plaintiffs' vendors as vendors for Alliance; in other words, a fiduciary duty owed by Alliance before Alliance became the vendors' broker. Such allegations also support the breach of fiduciary duty basis for Plaintiffs' tortious interference claims. Yet, to establish breach of a fiduciary duty, the duty must exist between the plaintiff and the defending party. See **Shervin v. Huntleigh Secs. Corp.**, 85 S.W.3d 737, 740 (Mo. Ct. App. 2002). In addressing these aspects of their tortious interference claims, Plaintiffs cite only to Missouri case law involving the breach of a fiduciary duty during an existing relationship, not before such a relationship, **Travagliante v. J.W. Wood Realty Co.**, 425 S.W.2d 208, 212 (Mo. 1968) (real estate broker relationship); **Missouri Highway & Transp. Comm'n v. Sample**, 702 S.W.2d 535, 538 (Mo. Ct. App. 1985) (employee relationship); **Dittmeier v. Missouri Real Estate Comm'n**, 237 S.W.2d 201, 206 (Mo. Ct. App. 1951) (real estate broker relationship); **Rosenthal v. Drake**, 82 Mo. Ct. App. 358 (Mo. Ct. App. 1900) (real estate broker relationship). Plaintiffs present no authority for the breach of fiduciary duty aspects of their tortious interference claims which arise before Alliance's broker

relationship with the relevant vendors.[61]

Therefore, Alliance is entitled to summary judgment as a matter of law on this aspect of Plaintiffs' tortious interference claims. Because Alliance is entitled to summary judgment on the breach of fiduciary duty and related fraudulent concealment aspects of the tortious interference claims against Alliance, Save-A-Lot is entitled to summary judgment on those grounds of the tortious interference claims against Save-A-Lot, which appear to be based on allegations it aided and abetted or controlled Alliance. The Court grants the summary judgment motions to the extent they address the breach of fiduciary duty and fraudulent concealment bases for Plaintiffs' tortious interference claims.

Defendants' pending summary judgment motions also raise issues pertaining to the allegations of fraudulent misrepresentations as a basis for Plaintiffs' tortious interference claims.

In its opening brief, Save-A-Lot argues, without citation to evidentiary material, that it did not hide "from Kroger the fact that Alliance spends a portion of its commissions on advertising services that it purchases from Save-A-Lot." (Def. Save-A-Lot Mem. Supp. Mot. Summ. J. against Pl. Resource One at 35 [Doc. 213].) Due to the absence of a reference to evidentiary material supporting this argument, the Court will not further discuss it and will deny the motion as to that argument. Save-A-Lot also reiterates its position, based on paragraph 9 of Hayes's affidavit, that Defendants' conduct in 2007 had no bearing on Kroger's

_____

[61] Significantly, Kroger did not hire Alliance; so there does not appear to be any basis for a breach of fiduciary relationship as between Kroger and Alliance.

decision to change its long-term broker relationship with Resource One. Due to the timing of Kroger's decision to change its broker relationship with Resource One in light of Defendants' effort to get Kroger to switch to Alliance, this is a question for the jury to decide. Under the circumstances, the Court will deny Save-A-Lot's motion for summary judgment against Resource One on the fraudulent misrepresentation basis for the tortious interference claim.

Save-A-Lot also seeks summary judgment against Halls Sales on this ground. Save-A-Lot expressly refers to evidence that Halls Sales's vendors were aware before they terminated Halls Sales that Alliance also represented the vendors' competitors and that commissions would be used to fund merchandising personnel.[62] In response, Plaintiffs point to evidence indicating the vendors do not know that a large amount of the money Alliance pays Save-A-Lot is not spent on merchandising personnel, but on advertising by Save-A-Lot, which vendors would not necessarily want to pay for because it is advertising for private label products or products carrying the Save-A-Lot label.[63] Under the circumstances, this is a jury issue.

In its opening brief against Halls Sales, Save-A-Lot also urges, without citation to evidentiary material, that it did not hide "the fact that Alliance re-invests a portion of its commissions on advertising and promotional services that it purchases from Save-A-Lot."

---

[62] See, e.g., Halls Dep. at 215-16, Ex. 12 to Save-A-Lot Mem. Supp. Mot. Summ. J. against Halls Sales [Doc. 225-1]; Cook Dep. at 103, 104, 108, Ex. 5 to id. [Doc. 224-5]; Arrington Dep. at 131, 152-53, Ex. 28 to id. [Doc. 228-4].

[63] See, e.g., Pls. Resp. Mots. Summ. J. at 118-19, 121 [Doc. 270]; Hoover Dep. at 79-81 [Doc. 270-37]; see also Stringer Report [Doc. 224-1].

(Def. Save-A-Lot Mem. Supp. Mot. Summ. J. against Pl. Halls Sales at 36 [Doc. 212].) As with Save-A-Lot's argument against Resource One, however, the evidentiary references made by Save-A-Lot are to the vendors' knowledge that Alliance represented competitors and would use commissions to fund merchandising personnel; Save-A-Lot makes no evidentiary references to the vendors' knowledge, if any, that Alliance was going to use a portion of its commissions "on advertising and promotional services that it purchase[d] from Save-A-Lot." Due to the absence of a reference to evidentiary material supporting this argument, the Court will not further discuss it and will deny the motion as to that argument as well.[64]

For the fraudulent misrepresentation basis of Plaintiffs' tortious interference claims, Alliance urges it is entitled to summary judgment because neither Plaintiff presents evidence that "Alliance made a single fraudulent misrepresentation to any supplier in the marketplace" and, even viewing the evidence in the light most favorable to Plaintiffs to find such a representation, neither Plaintiff has evidence establishing the other eight elements of a fraudulent misrepresentation claim. (Def. Alliance's Mem. Supp. Mots. Summ. J. at 39 and 38 [Docs. 200 and 204, respectively].) To the extent, however, that this basis of the tortious interference claims against Alliance is due to misrepresentations regarding use of commissions for advertising and promotional services, rather than for merchandising services, the Court

---

[64]   In its reply briefs, Save-A-Lot argues that Plaintiffs did not identify any material misrepresentations in support of the fraudulent misrepresentation basis of its tortious interference claim. (Save-A-Lot's Reply Brs. at 12-14 [Doc. 289] and at 11-12 [Doc. 291].) Because Save-A-Lot did not present an argument regarding the materiality of any alleged misrepresentations in its memoranda supporting its summary judgment motions, the Court will not address this argument.

will deny Alliance's motions.

*Violations of the Robinson-Patman Act, 15 U.S.C. § 13(c).*  The Robinson-Patman issues presented in the parties' materials addressing the pending summary judgment motions are the same as the Robinson-Patman issues presented in Plaintiff Halls Sales's motion for partial summary judgment, which the Court denied earlier [Doc. 304].[65]  Because the Court previously resolved the Robinson-Patman Act issues, the Court will not discuss those issues again in this ruling and adopts and incorporates in this ruling the discussion in the earlier resolution of Plaintiff Halls Sales's motion for partial summary judgment.  Based on that earlier order, Alliance's payments to Save-A-Lot may constitute a violation of the Robinson-Patman Act unless those payments are for valuable services rendered by Save-A-Lot to Alliance's vendors and those services are not de minimis.  To the extent the parties dispute whether Save-A-Lot provided the services claimed by Defendants for the payments Save-A-Lot received from Alliance, it is not clear what services rendered by Save-A-Lot for Alliance's payments were services rendered to Alliance's vendors, as opposed to other brokers' vendors or other vendors selling directly to Save-A-Lot, and whether or not any such services by Save-A-Lot were de minimis.[66]  Therefore, Defendants' motions for summary judgment to the extent

---

[65]  The Court is not setting forth the allegations supporting the Robinson-Patman Act basis of Plaintiffs' tortious interference claims due to the summary disposition of the pending summary judgment motions directed to those allegations.  It is not, however, clear that all the Robinson-Patman Act allegations may be pursued at trial due to the Court's resolution of the Robinson-Patman Act issues under the circumstances of this case.

[66]  Defendants point out that other grocer retailers engage in similar arrangements with their brokers.  While such arrangements may exist within the grocery industry, the record does not contain enough information to ascertain how those arrangements compare to the arrangement between

they address issues pertaining to the Robinson-Patman Act violations basis of Plaintiffs' tortious interference claims are denied.

*Missouri's Merchandising Practices Act.* For the alleged violation of Missouri's Merchandising Practices Act (MMPA) as a basis for their tortious interference claims, Plaintiffs allege that Defendants' conduct and statements "constitute the use of deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and the suppression, concealment and omission of material facts in connection with the selling and advertising of merchandise in trade or commerce." (Pl. Resource One Second Am. Compl. ¶ 47 [Doc. 123]; Pl. Halls Sales Compl. ¶ 55 [Doc. 1-3].)

The MMPA "serves as a supplement to the definition of common law fraud [and] eliminates the need to prove an intent to defraud or reliance." **Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.**, 199 S.W.3d 228, 232 (Mo. Ct. App. 2006). In relevant part, the MMPA provides that:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation , unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice.

Mo. Rev. Stat. § 407.020. The Missouri Supreme Court has found the words "unlawful practice" are "unrestricted, all-encompassing and exceedingly broad. For better or worse, the literal words cover every practice imaginable and every unfairness to whatever degree." **Ports**

_____

Defendants here.

**Petroleum Co., Inc. of Ohio v. Nixon**, 37 S.W.3d 237, 240 (Mo. 2001) (en banc).  Moreover, the term "merchandise" statutorily includes "services," Mo. Rev. Stat. § 407.010(4), which may encompass broker services.

Defendants argue they are entitled to summary judgment on the MMPA basis for Plaintiffs' tortious interference claims because Plaintiffs' vendors' purchases of Alliance's broker services were for business purposes rather than "primarily for personal, family or household purposes."  This argument is based on the MMPA's provision stating that

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action . . . to recover actual damages.

Mo. Rev. Stat. § 407.025.1.  As additional support for this argument, Defendants point out the MMPA's objective is consumer protection, citing **Gibbons v. J. Nuckolls, Inc.**, 216 S.W.3d 667, 670 (Mo. 2007) (en banc).  See also **Huch v. Charter Commc'ns, Inc.**, 290 S.W.3d 721, 724 (Mo. 2009) (en banc) (noting the "fundamental purpose" of the MMPA is to protect consumers and, "to promote that purpose, the act prohibits false, fraudulent or deceptive merchandising practices. [Mo. Rev. Stat.] Section 407.020").

A defendant's violation of a statutory provision is a wrongful act for purposes of a tortious interference claim, however, even if the plaintiff is not within the class of persons sought to be protected by the statutory provision, because the defendant does not have the right to violate a statutory provision to protect its own interest.  **Carter v. St. John's Reg'l**

**Med. Ctr.**, 88 S.W.3d 1, 14-15 (Mo. Ct. App. 2002). Therefore, this argument does not entitle Defendants to summary judgment on this issue even though Plaintiffs do not fall within the class of persons able to pursue a damages action for an MMPA violation. See **id.**; see also this Court's Memorandum and Order denying Alliance's motions to dismiss at 8-10 [Doc. 149].

Defendants also urge Plaintiffs' reliance on the MMPA is misplaced because Plaintiffs have not demonstrated that Defendants' conduct involved "the sale or advertisement of any merchandise in trade or commerce" as required by the MMPA's declaration of what constitutes an "unlawful act" in Mo. Rev. Stat. § 407.020.[67] Specifically, Save-A-Lot contends it engaged in purchases from vendors, rather than advertising or sales to vendors; and Alliance argues its challenged conduct focuses on "whether [it] is spending a portion of its brokerage commissions on services for its [vendors], and whether the [vendors] were informed of this fact," which have "no bearing on the sale of merchandise in commerce."

The relevant allegedly wrongful conduct under the MMPA that supports Plaintiffs' tortious interference claims, however, appears to be Defendants' marketing or advertising of Alliance's broker services to those who were Plaintiffs' vendors, resulting in those vendors' termination of Plaintiffs' services as a broker and those vendors' hiring of Alliance as a broker for those vendors' sales to Save-A-Lot. The MMPA defines "advertisement" as "the attempt

---

[67] The Court notes the MMPA broadly defines "trade" or "commerce" as "the advertising . . . of any services and any property, tangible or intangible, . . . and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state." Mo. Rev. Stat. § 407.010(7).

by publication, dissemination, solicitation, or circulation, or any other means to induce, directly or indirectly, any person to enter into any obligation or acquire any title or interest in any merchandise." Mo. Rev. Stat. § 407.010(1). Plaintiffs' tortious interference claims are based on allegations that both Defendants were involved in attempts through solicitations and other means, to induce vendors, directly or indirectly, to switch their broker services from Plaintiffs to Alliance. Therefore, neither the fact Save-A-Lot purchased products from vendors nor the fact that Alliance may have subsequently made payments to Save-A-Lot, which were or were not disclosed to the vendors, entitles Defendants to summary judgment on Plaintiffs' tortious interference claims based on Defendants' alleged violations of the MMPA. As to this ground, the motions for summary judgment will be denied as to both Defendants in all respects.

*Violation of the 1968 FTC Consent Order regarding Alliance.*[68] The parties do not dispute that in 1968 the FTC and Alliance entered into a consent cease and desist order prohibiting Alliance from engaging in certain conduct related to its then-existing business ("1968 FTC Order" or "Order"). This Order was not directed to and did not mention Save-A-Lot; and expired on January 2, 1996, see 16 C.F.R. § 3.72(b)(3). While there are certain

---

[68] In their complaints, Plaintiffs make allegations regarding the 1968 FTC Consent Order regarding Alliance in the section of allegations supporting the tortious interference claims that is captioned "Wrongful Means: Violation of Decree and Other Statutes and Regulations." (Pl. Resource One Second Am. Compl. ¶¶ 56-58 [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 48-50 [Doc. 1-3].) Because the 1968 FTC Consent Order is the only decree mentioned in that section of the complaints, and no other statutes or regulations are mentioned in that section, the Court understands this basis of the tortious interference claims arises solely out of Defendants' alleged violation of a 1968 FTC Order regarding Alliance.

exceptions to an FTC order's expiration under this regulation, see 16 C.F.R. § 3.72(b)(3)(ii)-(iii), there is no indication of record that those exceptions apply or that there is a question whether those exceptions apply to the 1968 FTC Order at issue here. Because it is undisputed that the period of time relevant to the tortious interference claims in this lawsuit is for a period after expiration of the 1968 FTC Order, and because that Order did not involve Save-A-Lot, Defendants' motions for summary judgment will be granted with respect to any alleged violation of the 1968 FTC Order as a basis for the tortious interference claims.

*Violation of Missouri Public Policy.* The allegations supporting Plaintiffs' tortious interference claims on the basis that Defendants' actions violate Missouri public policy state that Defendants' alleged business practices "rely upon deception, concealment, disloyalty, breaches of fiduciary duty, misrepresentation, extortion, . . . illegality under Federal and state law, [and] violation of a [1968 FTC Order], and are used to induce [vendors] to knowingly or unknowingly violate the law," which practices are against Missouri's public policy. (Pl. Resource One Second Am. Compl. ¶ 60 [Doc. 123]; Pl. Halls Sales Compl. ¶ 52 [Doc. 1-3].)

Missouri authority supports a tortious interference claim based on a violation of public policy. See **Pruitt v. United Healthcare Servs., Inc.**, Case No. 07-3307-CV-S-WAK, 2007 WL 4244998, at *1 (W.D. Mo. 2007) (noting the plaintiff was alleging, in a tortious interference action, that the defendants' actions in imposing a lien were not justified, were "contrary to law and public policy, and [we]re an effort to coerce funds from [the] plaintiff that are not due and owing"); **Groppel Co. v. U. S. Gypsum Co.**, 616 S.W.2d 49, 56 (Mo. Ct. App. 1981) (noting, in a defective product case, that a duty owed for purposes of a negligence

action "may have its source in statutes and regulations, third party beneficiary principles, and other considerations of public policy as developed in case law").  Plaintiffs do not cite to grounds for the public policy basis of the tortious interference claims other than the grounds discussed previously in this ruling.  Therefore, the Court will grant the motions and deny the motions based on the public policy grounds for the tortious interference claims based on the earlier discussion of the other grounds for the tortious interference claims.

Unfair Competition Claims.  For their unfair competition claims, Plaintiffs re-allege all prior allegations as constituting unfair competition and then allege that  Defendants' "conduct and statements are also immoral and unethical in the business community in that they involve a form of extortion and corporate bribery."  (Pl. Resource One Second Am. Compl. ¶¶ 63-64 [Doc. 123]; Pl. Halls Sales Compl. ¶¶ 53-54 [Doc. 1-3].)

As Alliance had argued in its earlier motion to dismiss, Save-A-Lot now urges that Missouri recognizes a common law unfair competition claim only in the context of misappropriation or use of another's identity or product identity, which is not at issue in this lawsuit.  This Court rejected that argument in the earlier order denying Alliance's motion to dismiss the unfair competition claims, and nothing in Save-A-Lot's argument persuades this Court to alter that ruling.  While Save-A-Lot cites in support of its argument cases that this Court referenced in the earlier dismissal ruling, Save-A-Lot also mentions one case not specifically identified in the earlier ruling, **Wakefern**, No. UNN C 34-95 at 18, 35-36.

In denying the plaintiff brokers' unfair competition claim, the court in **Wakefern** stated the:

[p]laintiff [brokers] . . . seek damages on the basis of "unfair competition" in that Wakefern granted MMI [a broker in a position to Wakefern that is similar to the position Alliance has with Save-A-Lot] a preferred broker[] status thereby changing the circumstances and competition to being one of not having a "level playing field."

The [plaintiff brokers] have been dealing with Wakefern for many years, by virtue of either a personal relationship with various officers of Wakefern and/or previously employ[ment] by Wakefern and continue to deal with Wakefern to the present day.

However, there is no law that requires Wakefern to treat every single broker in the same status. . . . MMI . . . became Wakefern's preferred broker because it offered to Wakefern different advantages not offered by [the plaintiff brokers].

Recognizing that MMI has the right to seek a competitive edge in the marketplace and seek to be designated as Wakefern's preferred broker, this court finds that as set forth in Gold Fuel Service, Inc. v[]. Esso Standard Oil Co., 59 N.J. Super 6 at 13 (Ch. Div. 1959) . . . the plaintiff[ brokers] . . . have no right to be protected against competition.

The evidence demonstrates that MMI does not have an unfair advantage over [the plaintiff brokers] and [MMI] represent[s] [vendors] in other parts of the country that are still represented by [the plaintiff brokers] for Wakefern. MMI, as well as [the plaintiff brokers], must meet Wakefern's criteria for cost, quality and services. If MMI['s vendors] do not satisfy those standards they are not selected as [vendors] to Wakefern.

MMI as the preferred broker still must meet the quality control set up by Wakefern. Evidence demonstrates that Wakefern rejected a private label [vendor]'s ketchup on grounds of quality control and subsequent thereto the [vendor] became represented by MMI and its product was again rejected for the same reason.

**Id.** at 35-36. Because the **Wakefern** opinion did not address Missouri unfair competition

issues, and was a decision after a non-jury trial, the Court is not persuaded that Save-A-Lot

is entitled to summary judgment in its favor on Plaintiffs' unfair competition claims based on

the **Wakefern** decision.

This Court previously decided that a Missouri unfair competition claim may encompass injurious tortious conduct, such as "interference in the commercial relations of a competitor resulting from unlawful threats directed at customers of the competitor." Order at 14-15, dated July 30, 2009 [Doc. 149] (internal quotation marks omitted) (quoting § 1 and comment g to § 1 of the Restatement (Third) Unfair Competition (1995)). This kind of interference may be presented as part of Plaintiffs' unfair competition claims. Plaintiffs cite to evidentiary material of record indicating that Plaintiffs may be able to substantiate this type of unfair competition claim. See Pls.' Resp. Defs.' Mots. Summ. J. at 130-32 [Doc. 270]. Defendants did not specifically point to contrary evidentiary materials with respect to this aspect of Plaintiffs' unfair competition claims.

Defendants did, however, summarily urge that, based on the arguments they presented in support of their motions for summary judgment on the tortious interference claims, they are entitled to summary judgment on Plaintiffs' unfair competition claims to the extent those claims are based on the same grounds as Plaintiffs' tortious interference claims. The Court resolves those arguments in the same manner that it resolved those arguments directed to the tortious interference claims. Therefore, for the same reasons used to resolve Defendants' summary judgment motions directed against Plaintiffs' tortious interference claims, the Court will deny in part and grant in part the summary judgment motions to the extent they are directed to Plaintiffs' unfair competition claims.

<u>Monetary and Injunctive Relief.</u>  For the tortious interference and unfair competition

claims, Plaintiffs seek both monetary relief and injunctive relief. (Pl. Resource One Second Am. Compl. at 25-27 [Doc. 123]; Pl. Halls Sales Compl. at 19-21 [Doc. 1-3].)

_Monetary Relief._ Save-A-Lot argues that Plaintiffs cannot recover monetary relief because such relief is speculative, citing in relevant part **Wash Solutions, Inc.**, 395 F.3d at 895-97 (vacating a jury verdict awarding tortious interference damages based on lost sales after the natural expiration of a contract, finding no evidence supporting a determination the parties' contract would be renewed and concluding the plaintiff's expectancy of contract renewal was mere speculation). A plaintiff may, however, be entitled to an award of damages on a tortious interference claim even in an at-will relationship. See **Topper**, 306 S.W.3d at 130-31, 131-33 (affirming an award of $1.1 million in actual damages and $2.1 million in punitive damages for intentional interference with an at-will contract, while reversing and remanding the judgment on the plaintiff's defamation claim). Additionally, while speculation is not sufficient to support an award of prospective or anticipated profits, "'[u]ncertainty as to the amount of profits that would have been made absent [the defendant's conduct] does not prevent a recovery.'" **Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.**, 155 S.W.3d 50, 55 (Mo. 2005) (en banc) (quoting Gasser v. John Knox Village, 761 S.W.2d 728, 734 (Mo. Ct. App. 1988)).

Here, both sides have experts' reports addressing damages issues and presenting different perspectives on Plaintiffs' damages claims.[69] The factual bases of the experts'

---

[69] See, e.g., orders denying parties' motions to exclude and to strike, dated October 27, 2010 and October 29, 2010 [Docs. 305 and 309, respectively]; Stringer Report, Ex. 1 attached to Exs.

opinions, which is a matter of credibility, rather than admissibility, will be the subject of cross-examination and the presentation of evidence at trial. See **Children's Broad. Corp. v. Walt Disney Co.**, 357 F.3d 860, 865 (8th Cir. 2004). Nothing in the present record indicates that a damages award is not possible if Plaintiffs are successful in proving at trial their claims and related damages. The parties' disagreement on the amount and basis of any such award are properly matters for resolution at trial.

Save-A-Lot also argues a subsequent "backroom services agreement" between Kroger and Resource One, which contains an integration clause superseding and canceling those parties' prior agreements, precludes Resource One's damages claims. This action, however, is not a breach of contract action. It is not clear how such an integration clause could eliminate a claim that prior tortious conduct by a third party resulted in an adverse change in the contracting parties' then existing relationship leading to the subsequent contract containing the integration clause. Save-A-Lot does not present Missouri authority for such a proposition.

Alliance's summary judgment motions do not challenge Plaintiffs' requests for monetary relief.

Defendants' motions for summary judgment on Plaintiffs' claims for monetary relief are denied.

*Injunctive relief*.[70] Plaintiffs asks the Court for a permanent injunction enjoining

Supp. Def. Save-A-Lot Mot. Summ. J. against Pl. Resource One [Doc.. 218-1].

[70] Plaintiffs have not sought or obtained a temporary restraining order or preliminary injunction in these cases.

Alliance from "sharing any portion of brokerage commissions it receives from [vendors] of Save-A-Lot with Save-A-Lot directly or indirectly," from "concealing material facts concerning its relationship with Save-A-Lot from [vendors] of Save-A-Lot represented by Plaintiff[s]," and from "encouraging or inducing Save-A-Lot to coerce, intimidate, or threaten with loss of business at Save-A-Lot, [vendors] who refuse to appoint Alliance . . . as their [broker]." (Pl. Resource One Second Am. Compl. at 26 [Doc. 123]; Pl. Halls Sales Compl. at 20 [Doc. 1-3].) Plaintiffs also request an injunction enjoining Save-A-Lot from "receiving any portion of the brokerage commissions paid to Alliance . . . by [vendors] of Save-A-Lot or from receiving any portion of any brokerage commissions paid by a[vendor] of Save-A-Lot to its broker or any discounts from such [vendors] in lieu of brokerage commissions"; from "directly or indirectly encouraging, inducing, pressuring, or intimidating its [vendors] into appointing Alliance . . . or any other broker as the [vendors'] broker on sales to Save-A-Lot"; and from encouraging or inducing Alliance . . . or any other broker to violate its duty of loyalty to [vendors] of Save-A-Lot." (Id.)

Defendants argue Plaintiffs are not entitled to the extraordinary remedy of an injunction because they have an adequate remedy at law in an award of damages. Plaintiffs counter that a plaintiff pursuing a tortious interference claim may be entitled to both a damages award and an injunction, citing **Re/Max of Am., Inc. v. Viehweg**, 619 F. Supp. 621, 627 (E.D. Mo. 1985).

"Because injunctions are intertwined with the remedy under substantive state law, [the Court] look[s] to Missouri law" to ascertain whether a permanent injunction should be

granted.  **Kelly**, 352 F.3d at 353 (discussing Missouri law).  In Missouri, a plaintiff pursuing

a tortious interference claim may seek monetary relief and injunctive relief.  See **Downey v.**

**United Weatherproofing, Inc.**, 253 S.W.2d 976 (Mo. 1953) (per curiam) (reversing the

dismissal of a petition found to have stated a claim for equitable relief).  To obtain permanent

injunctive relief the plaintiff must show that it has no adequate remedy at law and that

irreparable harm will result in the absence of the injunction.  **City of Greenwood v. Martin**

**Marietta Materials, Inc.**, 311 S.W.3d 258 (Mo. Ct. App. 2010); **City of Kan. City v. New**

**York-Kansas Bldg. Assocs., L.P.**, 96 S.W.3d 846, 855 (Mo. Ct. App. 2002); see also **Kelly**,

352 F.3d at 353.

> An injunction is an extraordinary and harsh remedy and should not be granted
> when there is an adequate remedy at law. [Walker v. Hanke, 992 S.W.2d 925,
> 933 (Mo. [Ct.] App. . . . 1999).  Generally, the phrase "adequate remedy at law"
> means that [an injunction is available when] damages will not adequately
> compensate the plaintiff for the injury or threatened injury.  Glenn v. City of
> Grant City, 69 S.W.3d 126, 130 (Mo. [Ct.] App. . . . 2002).  Irreparable harm
> can be found when pecuniary remedies fail to provide adequate reimbursement
> for improper behavior.  Id.

**City of Kan. City**, 96 S.W.3d at 855.

Here, any of Plaintiffs' business losses allegedly resulting from Defendants' allegedly

improper conduct may be compensated through a monetary award, such as an award of lost

profits due to the lost vendor business, to the extent Plaintiffs demonstrate that conduct

constitutes tortious interference or unfair competition as Plaintiffs claim.  Such an award will

provide Plaintiffs with adequate compensation and will adequately reimburse Plaintiffs for any

improper behavior by Defendants.  Therefore, Plaintiffs have an adequate remedy at law and

will not suffer irreparable harm if they do not obtain injunctive relief for Defendants' alleged tortious interference with Plaintiffs' relationship with their vendors and alleged unfair competition.

The Court finds distinguishable the **Re/Max of Am., Inc.** case, supra, on which Plaintiffs rely. The defendant in that case was the plaintiff's prior employee who took and continued to retain employment-related materials found to constitute trade secrets and similar materials, which the defendant disclosed to others and refused to return to the plaintiff. **Re/Max of Am., Inc.**, 619 F. Supp. at 625-27. These circumstances clearly are inapplicable here.

Plaintiffs urge they should be entitled to injunctive relief to "prevent the continuing wrongful conduct by Defendants in violation of Halls [Sales's] right to reap the profits from . . . existing contracts" with its vendors. In support of this argument, Plaintiffs cite to the affidavit of David Shogren as support for their position that injunctive relief is properly pursued by Resource One in that the vendors it now represents "have lost business . . . for refusing to appoint Alliance," and "proof of the actual reason [for the losses] is difficult." Difficulty of proof, however, does not entitle a party to permanent injunctive relief.

As further support for their request for injunctive relief, Plaintiffs note "[t]he specific wrongful conduct by Defendants that Plaintiffs seek to enjoin is the payment [or transfer] of commissions from Alliance to Save-A-Lot." To support relief for such payments, Plaintiffs will need to show they were injured by such payments as a result of Defendants' tortious interference or unfair competition. If such injuries are established, they will be business

losses that may be compensated by an award of damages. Such an award will adequately compensate Plaintiffs for any loss.

Plaintiffs are not entitled to injunctive relief under the circumstances, and Defendants' motions for summary judgment are granted on that ground. Therefore, the Court will not address Defendants' arguments that Plaintiffs are not entitled to injunctive relief based on the unclean hands doctrine.

## CONCLUSION

Defendants' motions for summary judgment will be granted in part and denied in part. Plaintiffs' motion for oral argument will be denied. These summary judgment rulings leave the following individual damages claims (and no claims based on a conspiracy theory) pending:

-- Resource One's tortious interference claim for damages against Save-A-Lot regarding Kroger only, based on all grounds except any alleged breach of fiduciary duty, fraudulent concealment, and violation of the 1968 FTC Order;

-- Resource One's unfair competition claim for damages against Save-A-Lot regarding Kahiki and Kroger, based on all grounds except any alleged breach of fiduciary duty, fraudulent concealment, and violation of the 1968 FTC Order;

-- Resource One's unfair competition claim for damages against Alliance regarding Kahiki and Kroger, based on all grounds except any alleged coercion or intimidation, breach of fiduciary duty, fraudulent concealment, and violation of the 1968 FTC Order;

-- Halls Sales's tortious interference and unfair competition claims against Save-A-Lot

for Baumer, Liberty Gold, Malt-O-Meal, and Lance, based on all grounds except any alleged breach of fiduciary duty, fraudulent concealment, and violation of the 1968 FTC Order; and

-- Halls Sales's tortious interference and unfair competition claims for damages against Alliance for Baumer, Liberty Gold, Malt-O-Meal, and Lance, based on all grounds except any alleged coercion or intimidation, breach of fiduciary duty, fraudulent concealment, and violation of the 1968 FTC order.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motions for summary judgment [Docs. 198, 202, 209, and 210] are **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiffs' joint motion for oral argument [Doc. 302] is **DENIED.**

**IT IS FINALLY ORDERED** that this matter is set for **a status conference in chambers on <u>Tuesday, December 28, 2010,</u> at 10:30 a.m.** Counsel must attend this conference, with their calendars, in order to set a trial date and a time for court-mandated ADR and to resolve whether or not these cases will be consolidated for jury trial, among other matters.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>15th</u> day of <u>December,</u> 2010.